UNITED STATES of America, by Nicholas DeB. KATZENBACH, Attorney General of the United States, Plaintiff,

v.

CLARKSDALE KING & ANDERSON COMPANY, a corporation, et al., Defendants.

Civ. A. No. DC 6461.

United States District Court
N. D. Mississippi,
Delta Division.

Nov. 11, 1965.

K. William O'Connor, Dept. of Justice Civil Rights Division, Washington, D. C., for plaintiff.

William H. Maynard, Clarksdale, Miss., for defendants.

**PROPOSED ORDER OF FINAL JUDGMENT OF PERMANENT INJUNCTION**

CLAYTON, District Judge.

On November 8, 1965, the above captioned case came on for hearing before the Court on plaintiff's motion for sum-

mary judgment, and the parties were represented before the Court by their respective counsel, and this Court, being fully advised in the premises, finds as follows:

### FINDINGS OF FACT

The premises known through July 7, 1964 as the Alcazar Hotel and Coffee Shop, since August 3, 1964, as the Regency Club and since February 1, 1965, as the Regency Club and Central Building, located at the corner of Yazoo and 3rd Streets in Clarksdale, Mississippi, are now and have been for some years the property of Clarksdale King & Anderson Company. W. K. Anderson is Vice President of this company and holds 40% of the stock. These premises contain some 60 usable rooms, and a coffee shop which does an annual business of about $85,000. About 80% of the occupied rooms in these premises have consistently been held by permanent residents; 20% of the occupied rooms were used by transients up to February 1, 1965. Occupancy level was ordinarily about 50%, and there were generally about 30 rooms unoccupied and available. A substantial portion of the food served in the Coffee Shop located in these premises originates outside of Mississippi and has moved in interstate commerce.

Up to the passage of the Civil Rights Act of 1964, the Alcazar Hotel and Coffee Shop were an all white restaurant and hotel. Fred E. Pelegrin was general manager of the hotel premises and assisted his wife in managing the coffee shop. The Pelegrins were employed by Clarksdale King & Anderson Company.

After the Civil Rights Act of 1964 was passed, the employees of Alcazar Hotel and Coffee Shop were instructed by Clarksdale King & Anderson Company to refuse service to Negroes, in accordance with the policy of the owners of the company.

On July 6, 1964, Rev. George W. Trotter, III, of Memphis, Tennessee, a Negro, attempted to obtain a room at the Alcazar Hotel, and Mrs. Vera Mae Pigee of Clarksdale, Mississippi, a Negro, attempted to obtain service at the Alcazar Coffee Shop; both were refused because of their race and color.

About July 7, 1964, the owners decided to close the Alcazar Hotel and Coffee Shop to avoid serving Negroes there. On July 27, 1964, the Regency Club, Inc. was founded; president of this corporation is Whitman Johnson and Secretary-Treasurer is Roy McInnis. On August 3, 1964, the following oral proposition of the Clarksdale King & Anderson Company was accepted by the Regency Club:

"President Johnson" * * * "reported to the Board that Clarksdale King & Anderson Company, a Mississippi corporation, had offered to furnish to the members of this club and their designated guests, to the exclusion of all other persons, all of the hotel and restaurant facilities which that company had at prevailing prices, with said corporation reserving the right to cancel said offer on 10 days' written notice to this club"

"After full discussion, a motion was made by Lester Sack, seconded by R. E. McInnis and unanimously adopted that the Regency Club, Incorporated, accept said offer of Clarksdale King & Anderson and avail itself exclusively of the proposals made in said offer, with the agreement on the part of said club to pay all prevailing prices for eating and rooming privileges offered by Clarksdale King & Anderson Company."

This was the entire agreement between Clarksdale King & Anderson Company and Regency Club, Inc. No financial payments were made by Regency Club to Clarksdale King & Anderson Company, or vice versa. All management and staff of the premises were provided by Clarksdale King & Anderson Company, and Fred Pelegrin remained as manager of the premises. Regency Club, Inc. could not tell Clarksdale King & Anderson Company how to manage the premises, and in the event of any conflict as to management policy or practice,

Clarksdale King & Anderson Company controlled. All revenue received from room rentals and coffee shop was deposited by Mr. Pelegrin in the K & A Club account for Clarksdale King & Anderson Company.

Between July 7 and July 27, the permanent residents of the premises were advised by manager Pelegrin that the Regency Club was being organized and that they could retain their rooms by filling in application blanks and paying $2.00 membership initiation fees. They retained their accommodations during this period. There was no formal agreement between Regency Club, Inc. and Clarksdale King & Anderson Company until August 3, 1964. The August 3, 1964 relationship remained in effect until February 1, 1965.

Mr. McInnis and Mr. Johnson are authorized to sign checks on the Regency Club bank account; the only revenue received by the club is membership fees.

Mr. Whitman Johnson, President of Regency Club, Inc., discussed opening the Alcazar Hotel and Coffee Shop as the Regency Club, Inc. with Mr. Pelegrin and Mr. W. K. Anderson. He understood that the premises were closed to avoid serving Negroes.

Membership in the Regency Club, Inc. is obtained upon the action of any two members of the Membership Committee; in practice, this has been Mr. Johnson and Mr. McInnis. Originally, the procedure followed for obtaining membership in the Regency Club was as follows: Application blank forms were available from the desk clerk on duty, an employee of Clarksdale King & Anderson Company, or from Mr. Pelegrin; the desk clerk was authorized to accept the application blanks and the initiation fees, but could not refuse to accept a tendered application. The application blanks, filled out and executed by prospective members, were kept at the desk until President Whitman Johnson came in to look at the applications. He did not check the references. Out of approximately 1000 applications, he might possibly have rejected two or three.

After the application blanks were examined by Mr. Johnson, Mr. Pelegrin took them to Mr. Roy McInnis, Secretary-Treasurer of the Regency Club. When the application blanks were presented to Mr. McInnis he understood Mr. Johnson had approved them and signed the membership card which Mr. Pelegrin presented to him with application. He signed almost all of the membership cards issued. He never rejected any application for membership, and had never been told by Mr. Johnson of any rejected application.

The applications for membership in the Regency Club were not designed by Mr. Johnson. On November 3, 1964 Mr. Johnson did not know the qualifications for admission to membership in the club.

On November 3, 1964, Mr. McInnis stated he did not know the qualifications for membership in the Regency Club, other than the filing of an application blank and the payment of $2.00 initiation fee and white skin. He acknowledged that the hotel premises were originally closed because Negroes sought accommodations there. Mr. McInnis neither checked the references of any applicant, nor caused such references to be checked by anyone else. Messrs. Johnson and McInnis routinely admitted persons whom they did not know or investigate to membership in Regency Club. Transient non-members were accommodated in the premises between August 3, 1964 and February 1, 1965.

In practice between August 3, 1964 and February 1, 1965, the desk clerk of the premises was authorized to accommodate white customers "on approval" upon the payment of the initiation fee and the filing of the application blank, if the applicant were a person of good demeanor. Manager Pelegrin adopted this policy at the instructions of Clarksdale King & Anderson Company. This practice was followed by the senior desk clerk, and all three desk clerks understood that the Regency Club arrangement was set up to avoid serving Negroes.

No Negro would be admitted to the Regency Club premises under the "approval" policy, although under this policy, any white person of good demeanor known to one of the staff of the premises would be accommodated.

On or about February 1, 1965, a new arrangement was entered into between Clarksdale King & Anderson Company and the Regency Club, Incorporated. This constituted a lease agreement pertaining to the restaurant premises, only. In return for a fixed rental, Regency Club was given the right to use the restaurant premises as it saw fit; the hotel portion of the premises was no longer under the control of Regency Club but was converted into office space and apartments. Hotel room accommodations ceased to be available to any persons and Manager Pelegrin was discharged. The Regency Club's sole relationship to Clarksdale King & Anderson Company was as stated in the lease. The amount of the annual rent was fixed at the annual profit Clarksdale King & Anderson Company had experienced from the restaurant operation in the past.

## CONCLUSIONS OF LAW

■ It is indisputably clear that a hotel and restaurant such as the Alcazar Hotel and Coffee Shop are places of public accommodation as defined by Title II of the Civil Rights Act of 1964; § 201(b) (1) and § 201(b) (4) (A) (i), Civil Rights Act of 1964. Moreover, the restaurant facility is covered by the act simply by virtue of the fact that a substantial portion of the food it serves has moved in interstate commerce; § 201(c) (2) Civil Rights Act of 1964.

The primary issue before the Court, then, is the determination as to whether or not the Regency Club, Inc. falls within the area of private club exemption from Title II of the Civil Rights Act of 1964, § 201(e) Civil Rights Act of 1964. That statute provides as follows:

§ 201(e) The provisions of this title shall not apply to a private club or other establishment not in fact open to the public, * * *.

■ From the legislative history, it is clear that the only clubs which meet the "factual" test of the statute are those whose "membership is genuinely selective on some reasonable basis." Specifically precluded from this exemption are "sham establishments" which "are in fact open to the white public and not to Negroes;" Cong.Record Vol. 110, Part 10, 88th Cong.2nd Sess. 6/13/64, p. 13,697.

■ This statute was designed to prevent the circumvention of the Civil Rights Act of 1964 by just such organizations as the Regency Club. As the facts show, the only stated qualifications for membership in the Regency Club are an application blank, $2.00, and white skin, for the officers who passed on membership could define these qualifications no more exactly than that. The officers who "passed" on the applications of several of the members of the Regency Club had no knowledge of these persons at all. Significantly, neither Pelegrin, Johnson or McInnis could recall at deposition a case of refusal of membership although Mr. Johnson seemed to feel that 2 or 3 applications might have been "laid aside." A desk clerk employed by Clarksdale King & Anderson Company apparently actually exercised the "selection" as to "membership" in the Regency Club. The application of the factual test of the statute to the Regency Club dispositively establishes that that organization is a "sham club" open to the white public and not to Negroes. This device is not novel: See, e. g., Castle Hill Beach Club v. Arbury, 2 N.Y.2d 596, 162 N.Y.S.2d 1, 142 N.E. 2d 186; Fletcher v. Coney Island, Ohio Com.Pl., 121 N.E.2d 574. To hold otherwise would frustrate the statute by exalting artifice over reality and form over substance; Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935). The restaurant originally called the Alcazar Coffee Shop, and now known as the Regency Club is, in fact, a place of public accommodation within

the purview of Title II of the Civil Rights Act of 1964. As such, all persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges and accommodations of this restaurant without discrimination or segregation on the ground of race, color, religion, or national origin; § 201(a), Civil Rights Act of 1964. The artifical device of the attempted exclusion of Negroes by the establishment of a sham club does not vitiate the application of the public accommodation law.

The subject hotel and restaurant operation, since the passage of the Civil Rights Act of 1964, has been conducted on three tiers: the initial phase of normal hotel and restaurant operation, the oral relationship of Clarksdale King & Anderson Company with Regency Club, and the final lease arrangement which now obtains between Clarksdale King & Anderson Co. and Regency Club.

Manifestly, the initial hotel and restaurant phase of the operation was subject to the Civil Rights Act of 1964; § 201(b) (1) Civil Rights Act of 1964. As such, the discriminatory conduct of that business is subject to injunction, as hereinafter ordered.

The second phase of the operation of the hotel and restaurant was equally subject to the Civil Rights Act of 1964, since as discussed, supra, the Court holds the Regency Club to be outside the ambit of the club exemption provided by § 201(e) of the Civil Rights Act of 1964. The parties thus subject to injunction at this phase include the Clarksdale King & Anderson Company, Regency Club, and their officers and agents, and those in concert or participation with them.

Finally, the third phase of the operation of the restaurant only is subject to the Civil Rights Act of 1964, as far as Regency Club is concerned, since the Court holds that club to be outside the exemption provisions of section 201(e) of the Civil Rights Act of 1964. Insofar as Clarksdale King & Anderson is concerned, however, the third phase of the operation is not subject to the same

injunctive relief, since at this phase or tier, that defendant had dissociated itself from participation in the operation of the restaurant and had terminated the operation of the hotel as such.

Accordingly, it is

### ORDERED, ADJUDGED AND DECREED

that Clarksdale, King & Anderson, William K. Anderson, Fred Pelegrin, their agents, employees, successors in interest and all those in active concert or participation with them, be, and they hereby are now and permanently enjoined from further conducting the operations of the Alcazar Hotel and Coffee Shop, alone, jointly, severally, or in conjunction with the Regency Club, Inc. in the manner in which these premises were operated prior to February 1, 1965 by:

(a) Refusing to admit Negroes to the premises of the named restaurant and hotel upon the same basis and under the same conditions as non-Negro members of the general public may be admitted;

(b) Failing or refusing to sell food or meals or lodging and to provide service to Negro patrons upon the same basis and in the same manner as food, meals, lodging and service may be made available to non-Negro members of the general public;

(c) Otherwise failing or refusing to make any of the goods, services, facilities, privileges, advantages or accommodations of the named restaurant and hotel available to Negroes upon the same basis and under the same conditions as they may be made available to non-Negro members of the general public, and,

(d) Engaging in any act or practice which deprives, directly or indirectly, any Negro of the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of the named establishments without

discrimination or segregation on the ground of race or color.

And, it is further

### ORDERED, ADJUDGED AND DECREED

that the Regency Club, Inc., Whitman Johnson, Roy McInnis, their agents, employees, successors in interest, and all of those in active concert or participation be, as of December 31, 1965, permanently enjoined from:

(a) Refusing to admit Negroes to the premises of the named restaurant now known as the Regency Club, upon the same basis and under the same conditions as non-Negro members of the general public are admitted; whether or not the Negroes seeking admission to the premises are members of the Regency Club;

(b) Failing or refusing to sell food or meals and to provide service to Negro patrons upon the same basis and in the same manner as food, meals, and service are made available to non-Negro members of the general public, whether or not the Negroes seeking service are members of the Regency Club;

(c) Otherwise failing or refusing, to make any of the goods, services, facilities, privileges, advantages or accommodations of the named restaurant available to Negroes upon the same basis and under the same conditions as they are available to non-Negro members of the general public, whether or not the Negroes are members of the Regency Club;

(d) Refusing to admit any Negro to the Regency Club restaurant on the ground said Negro is not a member of the Regency Club;

(e) Requiring any Negro to become a member of the Regency Club in order to obtain equal enjoyment of the goods, services, facilities,

privileges, advantages and accommodations of the Regency Club restaurant; and

(f) Engaging in any act or practice which deprives, directly or indirectly, any Negro of the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of the named establishment without discrimination or segregation on the ground of race or color.