CLOVER HILL SWIMMING CLUB, INC., PLAINTIFF-APPEL·
LANT, v. ROBERT F. GOLDSBORO AND DIVISION ON
CIVIL RIGHTS, DEPARTMENT OF LAW AND PUBLIC
SAFETY, STATE OF NEW JERSEY, DEFENDANTS-RE-
SPONDENTS.

Argued March 7, 1966—Decided April 4, 1966.

*Mr. Leslie B. Magee* argued the cause for appellant (*Messrs. Applegate, Quinn & Magee,* attorneys).

*Mr. Joseph Hoffman,* Assistant Attorney General, argued the cause for respondents (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Arthur N. Frakt,* on the brief).

The opinion of the court was delivered by

PROCTOR, J. The appellant, Clover Hill Swimming Club, Inc. (Clover Hill), appeals from an order of the Director of the Division on Civil Rights (Division) directing it to admit the respondent, Dr. Robert F. Goldsboro, to membership, to delete from its application form the request for information concerning church activities, and to cease engaging in any practices violative of the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq.* We certified the appeal on our own motion prior to argument in the Appellate Division.

On October 9, 1963 Dr. Goldsboro, a Negro veterinarian, filed a complaint with the Division alleging that he had been refused membership in Clover Hill because of his race. Thereafter, Clover Hill moved before the Appellate Division of the Superior Court for an order halting the proceedings on the ground that it was a distinctly private facility which was spe-

cifically exempt from coverage by the Law Against Discrimination. The court, however, declined to decide the question since there was no factual proof before it as to the nature of the entity. When the matter came before a hearing examiner, Clover Hill again alleged that it was a distinctly private organization over which the Division had no jurisdiction. The hearing examiner decided to reserve decision on the jurisdictional question until all the evidence concerning Dr. Goldsboro's complaint had been heard, whereupon Clover Hill refused to participate further in the hearing. Bailey Brower, the president of Clover Hill, walked out of the hearing on the advice of counsel, although he was under subpoena at the time and had been directed by the hearing examiner to remain. The hearing proceeded without Clover Hill, following which the hearing examiner recommended findings that Clover Hill was a public accommodation within the purview of the Law Against Discrimination and that it denied its accommodations to Dr. Goldsboro because of his race. *N. J. S. A.* 18:25–8(*l*). These findings were adopted, over Clover Hill's objections, by the Director of the Division. *N. J. S. A.* 18:25–17.

The evidence before the hearing examiner showed the following facts: Clover Hill Swimming Club, Inc. was incorporated on October 6, 1961, under the General Corporation Act, *N. J. S. A.* 14:1–1 *et seq.*, and is privately owned and operated for the purpose of returning a profit to its stockholders. It is organized principally to construct and operate "beach, swimming, tennis or recreation areas on the plan and form of a private membership club." The affairs of the corporation are managed by a four-man board of directors, all of whom must be stockholders. The president, who must be a director, has general control of the operation including the hiring, supervision, discharge and compensation of employees. No provision is made in the charter or the by-laws for any membership control of club activities. New members are recommended by a membership committee appointed by the board of directors. This committee, at the time of Dr. Goldsboro's

application, consisted of eight persons, including the president, his wife and two corporation employees. A unanimous vote of the members of the committee was required before an applicant could be admitted to membership in Clover Hill. The most active committee members appear to have been Mr. Brower, the president, his wife, and an employee, Mrs. John Miller.

Clover Hill began operations in 1963 and by the time Dr. Goldsboro applied in July of that year about 250 families held memberships, the total capacity of the club having been fixed at 400 families by the terms of the zoning variance under which it was built. Each member is required to buy a $350 debenture bond and to pay an annual fee of $150. The bond is non-interest bearing and non-transferable and the holder of a membership bond is given no voice in the conduct of the corporation's affairs.

During the period of construction and for some time thereafter, there was displayed at the entrance to Clover Hill a large sign (8' x 4') which read:

"Clover Hill. On this 170 acre site a private family club with complete recreational facilities. Lake swimming, tennis, skating, golfing. For information write or call P. O. Box 222, Millington, N. J., Fr 7-0658, Millington 7-9779."

The club also placed advertisements in several newspapers in the area. These advertisements, which gave safety advice to ice skaters, prominently displayed the club's name, address and post office box number.

Dr. Goldsboro, a resident of Passaic Township where Clover Hill is located, learned of the club from friends and from a newspaper article which described its facilities. He testified that he was attracted to nearby Clover Hill because he and his wife enjoyed swimming and because he wished to teach his son how to swim. He also testified that his annual income was $20,000 and that he would be capable of assuming the expenditures required of a club member. Dr. Goldsboro wrote to the club in July 1963 requesting an application, which he

received together with a two-page form letter and a brochure extolling Clover Hill's advantages.[1]

Dr. Goldsboro filled out and mailed the application. This form requested the applicant's religious affiliation and the names of two references, preferably club members. Dr. Goldsboro gave as reference Reverend (now Bishop) George Rath, his minister, and Dr. Joseph Gattuso. Dr. Gattuso was a member of Clover Hill while Reverend Rath was not. Dr. Goldsboro waited about a month and a half without receiving any word from the club. In the middle of August he called the club and spoke with Mr. Brower, who told him that his application would be acted upon unfavorably. When Dr. Goldsboro pressed him for a reason, Mr. Brower refused to respond.

---

[1] The laudatory nature of the brochure is exemplified by the following excerpt:

"ACTIVITIES IN CLOVER HILL SWIM CLUB center about a three acre lake filled with water from the club's deep well. The lake bottom is covered with stone and soft, white, seashore sand covers the beach and extends out into the water to wading depth.

Children may play safely on the spacious, 300 foot beach beside shallow water, while a 224 foot dock and deep water float provide an uncrowded area for swimming and diving. Spectator bleachers overlook 25 meter swim lanes in the special area where races, diving competitions, water ballet and life saving classes are held. Competitions with other clubs are scheduled regularly for the club's swimming teams. Daily practices under the guidance of the Swim Team Coach are held for boys and girls ranging in age from 15 & 16 to the 8 & under age group.

The water front is staffed with fully qualified Red Cross Water Safety Instructors and Senior Lifesavers. Lifeguards are on duty at all times the waterfront is open. An Emblem Testing Program for the children provides incentive, achievement, and instruction as well as safeguarding them while at the club. Swimming activities are on a seven day a week basis from Memorial Day through Labor Day.

Four tournament courts permit a full tennis program for adults and children from April to October. Intra-club and inter-club matches and tournaments are held for both adults and children. Tennis clinics are conducted by the club's instructor to teach children how to play tennis and to instruct them in sportsmanship and tennis etiquette.

Private and group lessons for tennis or swimming are available to the membership."

On August 23, several days after their telephone conversation, Mr. Brower wrote to Dr. Goldsboro that his original application had been lost. He also sent new forms which Dr. Goldsboro completed and returned to the club. By letter of September 10, Clover Hill acknowledged receipt of the new application. In a letter dated October 1, Mrs. Miller, chairman of the club's membership committee, informed Dr. Goldsboro that his references had been checked and were unacceptable because "neither reference knows you socially." Mrs. Miller concluded her letter by requesting that he send "the names of the club members you know socially and who would act as references and sponsors for you and your wife." Dr. Goldsboro did not respond to this letter and on October 9 he filed his complaint with the Division on Civil Rights. His last contact with Clover Hill was by letter of October 23 from Mr. Brower, in which he repeated Mrs. Miller's previous request to furnish additional references who were club members and who knew the Goldsboros socially.

Bishop Rath testified that Mr. Brower had called him in the middle of September concerning Dr. Goldsboro's application. He gave Dr. Goldsboro "a recommendation for acceptance on the basis of his character and standing in the community." Mr. Brower asked if he knew the applicant socially, if they "had dinner together and cocktails together and played cards together * * *." The Bishop replied that he had not but neither did he "have cocktails with or play cards with" many of his parishioners. He also testified that two other members of his congregation had given his name as a reference, and in neither instance was he asked about his social contacts with the applicant. In one case the club telephoned the Bishop's home and merely asked "was it all right?" When the Bishop said that it was, no further questions were asked. Bishop Rath said that he knew one of these applicants had become a member of Clover Hill and believed that the other had also been accepted.

Although the Goldsboros were never interviewed by Clover Hill, three witnesses testified that they had applied for mem-

bership and were personally interviewed soon after the submission of their applications. One of these witnesses also stated that, when he called the club to say that he could not supply references who were club members because the club had just started, he was told that the only references needed were those who could "testify to the fact that I was a citizen in good standing * * *."

A field representative of the Division on Civil Rights, who had been assigned to investigate the complaint, testified that as a result of his investigation he found that Clover Hill had no Negro members.

I.

The first issue on this appeal is whether the Clover Hill Swimming Club, Inc., is a place of public accommodation within the meaning of the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq.*

*N. J. S. A.* 18:25–4 provides, in pertinent part, that "All persons shall have the opportunity to obtain * * * all the accommodations, advantages, facilities, and privileges of any place of public accommodation * * * without discrimination because of race * * *." And *N. J. S. A.* 18:25–12(f) makes it an unlawful discrimination for a proprietor or an employee of any place of public accommodation to deny to any person such public accommodation on account of his race.

*N. J. S. A.* 18:25–5(*l*) includes in its definition of a place of public accommodation any "swimming pool" and "amusement and recreational park." Thus, the facilities offered by Clover Hill are encompassed by the statutory definition. However, subsection 5(*l*) also sets forth the following limitation:

"* * * Nothing herein contained shall be construed to include or to apply to, any institution, bona fide club, or place of accommodation, which is in its nature distinctly private;"

Clover Hill contends that it is specifically exempted under this part of the statute because it is an accommodation "which is in its nature distinctly private."

██ We do not agree. Clover Hill's organization and operation lead us to conclude that the club is not distinctly private in nature but is rather a public accommodation within the intendment of the statute. An establishment which by advertising or otherwise extends an invitation to the public generally is a place of public accommodation and cannot use race, creed or color as a basis for refusing to deal with those members of the public who have accepted the invitation. *Sellers v. Philip's Barber Shop*, 46 *N. J.* 340, at *p.* 345 (1966); *Fraser v. Robin Dee Day Camp*, 44 *N. J.* 480, 488 (1965); *Evans v. Ross*, 57 *N. J. Super.* 223, 231 (*App. Div.* 1959), certif. denied 31 *N. J.* 292 (1960). Clover Hill argues that it engaged in no public advertising, but its activities clearly indicate that it sought to attract new members from the public at large. Outside the entrance to the club a large sign had been placed describing its facilities and providing two telephone numbers and a post office box number at which further information could be obtained. Clover Hill also placed advertisements in several newspapers which prominently displayed its name and post office box number. Although these advertisements contained ice skating safety advice, it is hard to imagine that the printing of the post office box number could have had a purpose other than providing potential applicants with a means of communicating with the club. Persons who did write to the club were sent not only application forms but also extensive promotional literature which extolled the virtues of membership.

██ Clover Hill appears to think it significant that the variance under which its facilities were constructed permits it to have only 400 family members. However, the facilities of all accommodations, public or private, are limited in the number of persons who can be effectively served, and this limitation cannot act to change an otherwise public accommodation into a private one. Nor is it significant that Clover Hill bills its members annually rather than on a daily basis and requires them to purchase $350 debenture bonds. The mode of payment for use of an accommodation is not determinative of its

character. *Castle Hill Beach Club v. Arbury*, 2 *N. Y.* 2d 596, 601, 162 *N. Y. S.* 2d 1, 142 *N. E.* 2d 186, 187 (*Ct. App.* 1957).

Both in its sign at the club entrance and in its promotional literature Clover Hill referred to itself as a "private" facility. The literature also stated that all applications would be subject to approval by club officials. Clearly not every establishment using the "club" label can be considered "distinctly private." Self-serving declarations by the owner of an accommodation are not determinative of its character. In *Fraser v. Robin Dee Day Camp, supra,* the owner of a day camp for children had stated in a newspaper advertisement that all applications were subject to his acceptance. We held there that this unilateral declaration by the owner did not militate against the conclusion that the camp was a public accommodation. *Id.*, at *p.* 488.

The decision of Clover Hill's owners to organize and operate in the form of a private club should not be permitted to obscure the accommodation's non-private nature. In *Jones v. Haridor Realty Corp.*, 37 *N. J.* 384, 396 (1962) we said: "No device, whether innocent or subtly purposeful, can be permitted to frustrate the legislative determination to prevent discrimination." See also *Sellers v. Philip's Barber Shop, supra,* 46 *N. J.*, at *p.* 348. Clover Hill is a commercial venture operated to return a profit to its owners. All aspects of the enterprise's operations, including the selection of new members, are controlled by the board of directors which, by the terms of Clover Hill's certificate of incorporation, must be composed of stockholders. The statutory exemption for distinctly private organizations is designed to protect the personal associational preferences of their members. However, Clover Hill does not owe its existence to the associational preferences of its members but to the coincidence of their interest in the facilities offered by the owners.[2] In other

---

[2] Indeed, the affidavit which Mr. Brower filed with the Division states unequivocally that Clover Hill does not "encourage social activities among the adult members."

words, Clover Hill originated not because certain residents of Passaic Township wished to associate themselves in a swimming club, but rather because an entrepreneur was seeking a profitable investment. See Van Alstyne, "Civil Rights: A New Public Accommodation Law for Ohio," 22 *Ohio St. L. J.* 683, 687–690 (1961); *Konvitz & Leskes, A Century of Civil Rights,* 183–190 (1961).

In holding that Clover Hill is a public accommodation, we do not mean to imply that it cannot limit the use of its facilities to club members; we mean only that in the selection of such members there can be no discrimination because of race.

■ Clover Hill argues that any distinction under the Law Against Discrimination between *bona fide* private clubs and proprietary establishments operated on the private club plan would make the statute unconstitutional in violation of the equal protection clause of the Fourteenth Amendment. We have already held that Clover Hill is a public accommodation, so that the question is whether the differentiation between public accommodations and those accommodations which are distinctly private is constitutionally permissible. In *David v. Vesta Co.,* 45 *N. J.* 301, 314–315 (1965), we recently said:

"The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and therefore purely arbitrary. The constitutionality of a legislative classification is presumed, and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. * * *"

Certainly the Legislature could reasonably have determined that the evils of discrimination should be attacked in the public areas where they are most severely felt by those discriminated against and where interference with personal associational preferences is likely to be less than would occur in dis-

tinctly private accommodations. We note that New Jersey is not alone in making this type of distinction. Our neighboring states, New York and Pennsylvania, are but two of the states with similar provisions. *N. Y. Civil Rights Law, McKinney's Consol. Laws, c. 6, § 40; Pa. Stat. Ann., Title 18, § 4654(d).*

## II.

The second issue before us is whether there was sufficient evidence to support the determination of the Director of the Division on Civil Rights that Dr. Goldsboro was denied use of Clover Hill's facilities because of his race. Clover Hill contends that it did not act upon his application "for the sole reason" that he "failed to comply with the routine requirements regarding references."

██ The finding of an administrative agency on a factual question will generally be upheld if there is competent evidence in the record to support it. *Atkinson v. Parsekian,* 37 *N. J.* 143, 149 (1962). We have reviewed the record and are satisfied that there was substantial evidence to support the determination of the Director.

Dr. Goldsboro testified that Clover Hill did not respond to his application for a month and a half, and when he communicated with Mr. Brower, the club president, he was told that his application would be denied although no reason was given. This uncontradicted testimony makes unbelievable Clover Hill's belated position that it did not act on Dr. Goldsboro's application because the references he gave were unsatisfactory. Moreover, there is ample evidence that his application was singled out for different treatment than that accorded other applications. Clover Hill insisted that Dr. Goldsboro's two references be club members, although the application form itself said only that references should be "preferably Club Members." Indeed, an absolute insistence that references be club members would have been unrealistic since Clover Hill had just started operating. The club also asserted that Dr. Goldsboro's references were defective because they did not

know him socially. However, the record clearly shows that the club did not insist on this requirement with other applicants. A profit-making business could not possibly survive if all applicants were treated as the Goldsboros were. See *Fraser v. Robin Dee Day Camp, supra,* at p. 484.

### III.

When Dr. Goldsboro's complaint came before the Division on Civil Rights, Clover Hill moved for a dismissal on the ground that it was a distinctly private accommodation over which the Division had no jurisdiction. The hearing examiner decided to reserve decision on this motion until all the evidence concerning Dr. Goldsboro's allegations had been heard. Mr. Brower and his attorney then walked out of the hearing, although Mr. Brower was under subpoena at the time and had been directed to remain.

Clover Hill contends that the hearing examiner erred in refusing to rule on the jurisdictional question before receiving evidence as to whether discrimination actually occurred. This contention is without merit. The hearing examiner does not have the power to rule on basic questions of fact or law but rather he makes recommendations which are then acted upon by the Director of the Division. *N. J. S. A.* 18 :25–8(*l*) ; *N. J. S. A.* 18 :25–17. In the present case the hearing examiner decided that, since the questions of jurisdiction and of actual discrimination were so closely interwoven, he would delay making any recommendations until all the evidence had been heard. We think that the hearing examiner acted properly. Many of the witnesses on the jurisdictional question were also witnesses on the discrimination issue, and separate factual hearings as demanded by Clover Hill would have necessitated duplicative testimony and a waste of time for all concerned.

The order of the Director of the Division on Civil Rights is affirmed.

38 

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.