UNITED STATES of America,
Appellant,

v.

A. W. RICHBERG, d/b/a Richberg's Cafe,
Appellee.

No. 24493.

United States Court of Appeals
Fifth Circuit.

July 12, 1968.

As Modified on Denial of Rehearing
Aug. 1, 1968.

Robert E. Hauberg, Jackson, Miss., David L. Norman, Michael Flicker, Washington, D. C., for appellant.

Gene Brown, R. Dan Coit, Meridian, Miss., for appellee.

Before COLEMAN and GOLDBERG, Circuit Judges, and HANNAY, District Judge.

GOLDBERG, Circuit Judge:

The Civil Rights Act of 1964 with its public accommodation section [1] became

---

1. SUBCHAPTER II.—PUBLIC ACCOMMODATIONS

42 U.S.C. § 2000a: "Prohibition against discrimination or segregation in places of public accommodation—Equal Access

(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

Establishments affecting interstate commerce or supported in their activities by State action as places of public accommodation; lodgings; facilities principally engaged in selling food for consumption on the premises; gasoline stations; places of exhibition or entertainment; other covered establishments

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

 * * * * *

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or

the law on July 2, 1964. On April 14, 1966, this action was filed in the federal district court below pursuant to Section 206(a) of the Act. 42 U.S.C. § 2000a–5 (a). The complaint alleged that the policy and practice of Richberg's Cafe was to segregate its customers by race, and to refuse service whenever customers failed to abide by this policy. Injunctive relief was sought. The district court found that Richberg's Cafe was covered by the Act, but it dismissed the suit, determining that the cafe was now a private club within the meaning of 42 U.S.C. § 2000a(e),[2] and that all of the alleged acts of discrimination occurred prior to the club's creation. The United States has appealed the district court's denial of injunctive relief. We reverse.

Richberg's Cafe is situated along U. S. Highway 11, a main thoroughfare between Meridian, Mississippi, and New Orleans, Louisiana. The trial court found that the cafe was constructed in "southern style." In the present context this meant that the merchandise was displayed in the center along a partition which separated the Negro section, containing four or five stools on the west side, from four or five stools on the east side of this wall for white patrons only. Separate doors were provided for the two races at the front of the building.

Adjoining the cafe were gasoline pumps where Sinclair gas was dispensed to interstate travelers. These travelers sometimes dined in the cafe which was found by the district court to have bought and sold substantial quantities of food originating in interstate commerce. This finding was based on uncontradicted evidence that Richberg's Cafe made meat purchases in significant dollar amounts from a local packing company that acquired approximately 40% of its meat outside Mississippi, and on evidence showing that bread, soft drinks and pastry purchased by the cafe either originated out of state or were made with ingredients that had moved in interstate commerce. These facts, so clearly supported by the record, leave no doubt that Richberg's Cafe falls within the ambit of the 1964 Civil Rights Act.[3] What remains to be determined is whether the Dixie Diner Club, hastily established on the premises of Richberg's Cafe *subsequent to the initiation of this action,* is a bona fide club excepted from the Act by section 201(e).

The facts which determine the nature and characteristics of the Dixie Diner Club have been set out by the district court, and with these limited findings we take no issue. The club is found to have officers, by-laws, rules and regulations. Only members are allowed in the club area, and guests must be and according to the trial court have been accompanied at all times by a member. On

---

other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station; * * * "

2. Private establishments
 42 U.S.C.A. § 2000a(e):
 "The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section. Pub.L. 88–352, Title II, § 201, July 2, 1964, 78 Stat. 243."

3. The appellee has taken issue with the district court's ruling that Richberg's Cafe is within the coverage of the Civil Rights Act, yet this Court has recently determined on similar facts that establishments such as Richberg's Cafe have the requisite contacts with interstate commerce. Gregory v. Meyer, 5 Cir. 1967, 376 F.2d 509, 510–511. The failure of the district court to compare the dollar amount of food having an interstate origin with the cafe's total food purchases is of no consequence where the purchases involved are unquestionably more than just minimal. Gregory v. Meyer, supra, at 511 n. 1. Likewise, the absence of an explicit finding that the cafe was a "facility principally engaged in selling food for consumption on the premises" is of no importance since the record as a whole, including testimony of Richberg himself, clearly establishes that requirement.

the basis of these few facts the district court determined that the Dixie Diner Club "is a club established in good faith for the purpose of complying with this Act." These findings are insufficient.

■ Whether or not an institution is a "club" within the meaning of section 201(e) is a question of law once the underlying facts have been determined. Such a determination is not an inference discoverable from "experience with the mainsprings of human conduct." Lundgren v. Freeman, 9 Cir. 1962, 307 F.2d 104, 115, but an applicable legal standard whose dimensions must conform to the legislative purpose that prevailed at its inception. Were this not so, the meaning of "club" might change with each new case, and the body of the Act fall victim to its own protean exception.

This is not to say that necessity has bred clarity and that the meaning of the term "club" in section 201(e) is plain for all to see. But in determining whether the facts as found by the district court transformed Richberg's Cafe into a "club" within the meaning of the Act, we are not constrained by the clearly erroneous rule. Rather the correct approach is that of Duquesne Club v. Bell, 3 Cir. 1942, 127 F.2d 363, 364, cert. den., 317 U.S. 638, 63 S.Ct. 30, 87 L.Ed. 514, where the meaning of the term "social club" within the Revenue Act of 1928 was held to be a question of law free from the strictures of Rule 52(a):

" * * * The sole question in this case is whether the Duquesne Club is a social club within the meaning of the statute, there being no claim that it is either athletic or sporting. The suggestion was made at argument that the question is one of fact and that the determination thereof by the trial judge was entitled to the same consideration under Federal Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, given to other findings of fact. This point is not well taken. Findings or stipulations with regard to the use made of club property, the nature of that property, the number of members, etc., are findings of evidential facts, and we accept them, as the rule provides, unless clearly erroneous. But whether, upon facts so found, plaintiff is a social club within the meaning of the taxing statute is a finding not within the rule and is reviewable by this Court. The term 'social' when used in a statute imposing a tax, necessarily becomes a term of art, even though an elusive one. While we make no pretense of being able to give it a definition which will be self-operative to settle other cases, we must, nevertheless, determine as best we can whether the facts bring this club within the term used in the statute. The facts we take from the trial court; the conclusion upon them must be our own."

In other contexts, the existence of a "club" within a statutory scheme has been held to be a question of law, Jeffery v. Planning and Zoning Bd. of Appeals etc., 1967, Conn., 232 A.2d 497, and in Baldwin v. Morgan, 5 Cir. 1951, 287 F.2d 750, 752, Judge Brown said in a segregation case involving injunctive relief: "The fact findings after a full trial come here with the insulation of F.R.Civ. P. 52(a), 28 U.S.C.A. While we reach a conclusion contrary to that of the District Court, we do so on the basis of the facts which are substantially without controversy." This too is our procedure. "We resort to the record not to contradict the trial court's findings of *fact,* as distinguished from its conclusory 'findings,' but to supplement the court's factual findings and to assist us in determining whether they support the court's ultimate legal conclusion * * *." United States v. General Motors Corp., 384 U.S. 127, 141 n. 16, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415, 424.

Turning to the record we note that the precise natal day of the Dixie Diner Club is uncertain. Although a government witness testified that she thought the "clubroom" was partitioned off about three months prior to trial, Richberg himself testified that the first membership card was not issued until May, 1966

(about one month after suit was filed), and that a card was a prerequisite to membership status. Such cards are apparently issued upon request (with little or no investigation) by any one of several individuals, even though the by-laws require unanimous approval by the Board of Directors. The by-laws also require that officers of the "club" be members of the organization. Yet, Richberg, who styles himself as treasurer, insists he is not a member. Furthermore, several avowed members were even less cognizant of the club's characteristics than Richberg, for they were ignorant not only of the manner in which new members were selected, but of the very name of the club itself. Such stunning dedication among the membership to an organization of which they claim to be a part may arise from the fact that the "club" has never held a meeting.

The Dixie Diner Club, is devoted, in the words of its by-laws, to "The creation of an atmosphere conducive to the development of connoisseurs of discriminating taste and epicurean pleasures and the strengthening of a fraternal fellowship among the members." Given these high purposes, and assuming for the sake of argument that the club was genuine, we would not expect to find, as the record conclusively shows, that the club has maintained the same food, menu, prices and serving personnel as formerly characterized the operations of Richberg's Cafe, and as still characterize the cafe's operations today. In plain words, the clubroom is identical to the cafe in all matters pertaining to food and service. The only material difference between the two relates to their terms of access; physically the club is attainable only by entrance at the door which formerly was for whites only.

█ Under these circumstances we may appropriately ask whether the club members have fulfilled or at least actively pursued the club's stated objectives. We find the following: In the interest of fellowship they have held no meetings, established no committees, planned no enterprises; in pursuit of culinary ex-

cellence, their food is the same as in its pre-club days; in their passion for privacy, they are indifferent to their own by-laws and the method by which new members are chosen; and in their concern for efficiency, they have turned over all of the club's profits and all of its operations to one man. The Dixie Diner Club has no lease, pays no rent, keeps no bank account, elects no officers. The membership fee is one dollar. All indications point to the fact that the club exists only by and through the sufference of Richberg. We cannot close our eyes to these facts. A cafe cannot, by drafting itself a set of by-laws, become an exempt club.

We have considered United States by Katzenbach v. Jack Sabin's Private Club, E.D.La.1967, 265 F.Supp. 90, where the facts were even more favorable to club status than those before us. In that case, a restaurant known as Jack Sabin's Restaurant and Lounge was formally incorporated into Jack Sabin's Private Club under the laws of the State of Louisiana. The club was declared a non-profit organization. The articles of incorporation vested management of the club in its three officers who were denominated a Board of Trustees, and the by-laws authorized Jack Sabin without prior trustee or membership approval to mail out membership cards. Members were required to present cards upon entering the club.

On the date of incorporation, the Board of Trustees (Jack Sabin, his wife and daughter) adopted a resolution authorizing the club to enter into a management contract with Jack Sabin personally. The agreement provided that Jack Sabin would provide the club with furniture, fixtures, buildings, a stock of merchandise, and serving personnel in return for all the profits derived from the operations of the club. Despite such formality, the real purpose of the arrangement was not missed by the district court. Looking beyond the language of the agreement to its actual effects, the court noted:

"The monthly expenditure for food, beverages, and other products has remained substantially the same; the

hours of operation are substantially the same; the number of persons employed by Jack Sabin has been substantially the same; and the amount and nature of advertising has been substantially the same." 265 F.Supp. at 92–93.

For these, and other like reasons, the court found "as a matter of law that Jack Sabin's Private Club is not, in fact, a private club * * *." United States v. Jack Sabin's Private Club, supra, at 94. The decision went against the club despite the formality of incorporation, compliance with its own by-laws, and a contractual arrangement with its manager. In its findings of fact, the court specifically listed such matters as the similarity of operations before and after the club's inception, the fact that all profits from the operation of the club inured to the sole benefit of Jack Sabin, the total absence of club meetings, and the lack of genuinely collective action in the choice of new members. None of these factors, of course, is by itself determinative, nor are they necessarily conclusive as a group. But they are all clearly relevant in determining whether or not an establishment is a *bona fide* "club" within section 201(e) of the 1964 Civil Rights Act.

The need for such inquiry into the bona fides of a club is demonstrated by the legislative history of the Act. During the debates on the Act in Congress, and specifically on section 201(e), former Senator and now Vice President Humphrey indicated in response to a question by Senator Smathers that abuse of the exemption would not be permitted:

"If a club were established as a way of by-passing or avoiding the effect of the law, and it was not really a club— I am sure the Senator knows what I mean—and there are clubs like that in existence, where anyone can step up and pay $2 and in that way become a member, and with the $2 being used as a kind of cover charge, that kind of a club would come under the language of the bill." S.Rep. No. 110, 88th Cong. 2nd Sess. 6008 (1964).

Later in the hearings Senator Magnuson analyzed the Act in some detail. His observations reaffirmed those of Senator Humphrey:

"The clubs exempted by section 201(e) are bona fide social, fraternal, civic, and other organizations which select their own members. No doubt attempts at subterfuge or camouflage may be made to give a place of public accommodation the appearance of a private organization, but there would seem to be no difficulty in showing a lack of bona fides in those cases." S. Rep. No. 110, 88th Cong. 2nd Sess. 7407 (1964).

Further legislative history evidencing the Congressional concern with disingenuous or sham clubs is set forth in United States v. Clarksdale, King & Anderson Co., N.D.Miss.1965, 288 F.Supp. 792. We find the following observations in that opinion by Judge Clayton particularly instructive:

"From the legislative history, it is clear that the only clubs which meet the 'factual' test of the statute are those whose 'membership is genuinely selective on some reasonable basis.' Specifically precluded from this exemption are 'sham establishments' which 'are in fact open to the white public and not to Negroes;' Cong. Record Vol. 110, Part 10, 88th Cong. 2nd Sess., 6/13/64; p. 13,097.

"This statute was designed to prevent the circumvention of the Civil Rights Act of 1964 by just such organizations as the Regency Club. As the facts show, the only stated qualifications for membership in the Regency Club are an application blank, $2.00, and white skin, for the officers who passed on membership could define these qualifications no more exactly than that. The Regency Club * * * is a 'sham club' open to the white public and not to Negroes. This device is not novel. * * * To hold otherwise would frustrate the statute by exalting artifice over reality and form over

substance. * * * " 10 Race Rel.L. Rep. at 1765.

United States v. Clarksdale, supra, is entirely apposite to the case before us. The membership of the Dixie Diner Club exercised perhaps even less control over the selection of its members than did the membership of the Regency Club. In both, race was the only ground for exclusion. A nominal admittance fee was their mutual hallmark. What differences can be found to exist between them only emphasize the greater need for action against Richberg's Cafe and its recent offspring, the Dixie Diner Club.

Richberg wants us to believe that he was cuisine conscious but not pigment minded. He wants us to give credence to a club that was nothing more than a subjective cerebration arising perhaps out of the chance conversation of a few friends. This we cannot do. The Dixie Diner Club has the birthmark of law evasion. Its existence is transparently meretricious and paper thin. To hold that it was an exempt club would make a mockery of the club exemption, would pervert the congressional purpose, and would legitimize a mere stratagem. Courts need not be so naive.

 A club is a pluralistic enterprise. Cf. Clover Hill Swimming Club, Inc. v. Goldsboro, 1966, 47 N.J. 25, 219 A.2d 161, 166. It cannot be one man's principality or domain. It cannot be his alter ego. In this sense the Dixie Diner Club was a club in name only, and a facade to permit Richberg's Cafe to continue in its racially discriminatory ways of yesterday. A club must have substance, and we need not abide the trial court's conclusion where the controlling criteria of a club within the meaning of the statute have not been applied, Duquesne Club v. Bell, supra, and where the conclusion is not adequately supported by the record, United States v. General Motors Corp., supra; Gillespie v. Lake Shore Golf Club, 1950, Ohio App., 91 N.E.2d 290, 292. Richberg had the burden of proving that the Dixie Diner Club was a genuine club not open to the public because he claimed the shelter of an exception, United States v. First City National Bank of Houston, 1967, 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151, 155; FTC v. Morton Salt Co., 1948, 334 U.S. 37, 44–45, 68 S.Ct. 822, 92 L.Ed. 1196, 1203; Javierre v. Central Altagracia, 1910, 217 U.S. 502, 507–508, 30 S.Ct. 598, 54 L.Ed. 859, 861, and because the facts of proof are with him. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89. We find, as a matter of law, that the Dixie Diner Club is not within section 201(e) of the Act.

 Once stripped of its club exemption, Richberg's Cafe resolves itself back into a single entity, and its policies become subject to the Civil Rights Act like any other covered public establishment. We must therefore inquire into the acts of discrimination with which it is charged, and determine from them whether the trial court's denial of an injunction was justified.

The record shows that Richberg's Cafe has been operated on a segregated basis since at least the end of World War II. One witness testified that from 1945 when he first began patronizing the cafe up until the present, he has never seen a Negro on the "white side" of the cafe, nor a white on the "Negro side." Richberg testified that there is no cafe in Enterprise, Mississippi, that serves both white and colored people in the same room with the same facilities in the same manner without discrimination.

The fruits of this practice were bitterly tasted in the summer of 1965 when two Negroes and two whites sought service at Richberg's Cafe. According to the uncontradicted testimony of one witness, they all entered on the Negro side of the cafe and requested sandwiches. The two whites were then told by Richberg that they would have to go around to the other side of the cafe if they wished to be served, and as the whites stepped out the door of the cafe, Richberg hit one of them on the side of the head. Richberg attempted to explain his conduct, but his

explanation does not seem to have been accepted by the district court.

In the months just prior to the commencement of this action, Richberg began to partition off the white section of the cafe and to make of it a clubroom for the Dixie Diner. Since that time (and, of course, prior to it) no Negro has entered the clubroom. One of the defense's own witnesses testified that he joined the club specifically to eat in a place where no Negroes would be allowed.

Finally, in the summer of 1966 and as recently as two months prior to the trial in December, government witnesses testified to various acts of discrimination at the cafe. Despite this testimony, despite the cafe's long previous history of segregation, and despite the establishment of a "club" which we hold was nothing but a device to circumvent the Act, the district court refused to issue an injunction. The court based its refusal on the finding that: "At the time of the trial and for more than seven months prior thereto, there is absolutely nothing in this record to indicate that this man [Richberg] has not complied with this Act, or has violated this Act in any respect."

On the record considered as a whole, we must hold that this finding was clearly erroneous. See United States v. United States Gypsum, 1948, 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746; United States v. McLeod, 5 Cir. 1967, 385 F.2d 734, 751. The district court found by necessary implication that until seven months prior to the institution of this suit Richberg *was* in violation of the Civil Rights Act. No inference of re-form or indication of good faith is derivable from the creation of the Dixie Diner Club. It was at best a club in name only, at worst a cynical canard designed to evade the application of the Act. With its demise there is no longer any basis for adhering to the district court's conclusion.[4] Certainly Richberg has offered no assurances that he will change the practices of the past. Cf. N.A.A.C.P. v. Thompson, 5 Cir. 1966, 357 F.2d 831, 838, cert. den. sub. nom., Johnson v. N.A.A.C.P., 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed. 2d 58. Under these circumstances we hold that the district court's refusal to issue an injunction was an abuse of discretion. United States v. Dogan, 5 Cir. 1963, 314 F.2d 767, 772. See also, N.A.A.C.P. v. Thompson, supra, 357 F.2d at 839; United States v. Logue, 5 Cir. 1965, 344 F.2d 290, 291.

"It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform * * *." United States v. Oregon State Medical Soc., 1951, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978. See also, Bailey v. Patterson, 5 Cir. 1963, 323 F.2d 201, 205. Here such protestations were not even offered. No acts of expiation appear. Even were there evidence that the illegal activities of the past had ceased, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." United States v. W. T. Grant Co., 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303. See also, Pullum and United States of America v. Greene, et al., 5 Cir. 1968, 396 F.2d 251 [June 18, 1968]; Bailey v. Patterson, supra, 323 F.2d at 291. But no such evidence appears.

4. In support of its finding of compliance, quoted supra, the district court stated: "This private club is expressly excluded from the provisions of the act and not one witness has said that he or she was denied service anywhere in this establishment (outside this club area) within seven months prior to the trial of this case." The refusal to issue an injunction was, then, based substantially on the determination of legal compliance through the club exemption. "Findings induced by or resulting from, a misapprehension of controlling substantive principles lose the insulation of F.R.Civ.P. 52(a) and a judgment based thereon cannot stand." Davis v. Parkhill-Goodloe Co., 5 Cir. 1962, 302 F.2d 489, 491. See also Continental Motors Corp. v. Continental Aviation Corp., 5 Cir. 1967, 375 F.2d 857; Fulton National Bank v. Tate, 5 Cir. 1966, 363 F.2d 562, 567; Mitchell v. Mitchell Truck Line, Inc., 5 Cir. 1961, 286 F.2d 721, 723.

This court must look to the future as well as to the past. We must insure that wrongs are not repeated, and that there is fealty to the law. In considering the necessity for injunctive relief, we bear in mind that "[t]he purpose of an injunction is to prevent future violations." United States v. W. T. Grant Co., supra, 345 U.S. at 633, 73 S.Ct. at 898. We have no "reason to believe that there is any intention on the part of defendant[s] to desist from such conduct in the future." N.A.A.C.P. v. Thompson, supra 357 F.2d at 838. In light of that belief, and under the circumstances already delineated, we find that an injunction should have issued.

The frustration of the Civil Rights Act of 1964, as chronicled here, is not tolerable.

Reversed.