No. 70,772

BRADFORD W. SEABOURN, *Appellant,* v. CORONADO AREA COUNCIL, BOY SCOUTS OF AMERICA, a Kansas Not For Profit Corporation, and BOY SCOUTS OF AMERICA, a Washington, D.C., Not for Profit Corporation, *Appellees.*

(891 P.2d 385)

Opinion filed March 10, 1995.

*Robert Littell*, of Manhattan, argued the cause, and *James Grafton Randall*, of Anaheim Hills, California, was with him on the briefs for appellant.

*John D. Conderman*, of Arthur, Green, Arthur, Conderman & Stutzman, of Manhattan, argued the cause, and *George A. Davidson* and *Carla A. Kerr*, of Hughes Hubbard & Reed, of New York, New York, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Bradford W. Seabourn appeals from summary judgment granted to the defendants, Coronado Area Council, Boy Scouts of America, a Kansas not for profit corporation, and Boy Scouts of America, a Washington, D.C., not for profit corporation (the defendants hereinafter are referred to as the Boy Scouts), ruling that "Boy Scouts is not a public accommodation" as that term is used in the Kansas Act Against Discrimination, K.S.A. 44-1001 *et seq.*

The court ruled that the Boy Scouts could legally deny Seabourn's registration to serve as an adult leader of the Boy Scouts because of his unwillingness to subscribe to the religious principles of the organization. For the reasons set forth in this opinion, we agree that the Boy Scouts are not "public accommodation" under the Kansas Act Against Discrimination and affirm.

The Boy Scouts of America was incorporated in 1910 in the District of Columbia. In 1915, the First Session of the 64th Con-

gress of the United States of America undertook to incorporate the Boy Scouts. Section 3 of the Charter stated:

"That the purpose of this corporation shall be to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."

Section 4 reflected that the "object and purposes [of the Boy Scouts were] solely of a benevolent character and not for pecuniary profit to its members."

In the "Congressional Report in Support of Act to Incorporate Boy Scouts of America" it is stated:

"The Boy Scout movement is . . . intended to supplement and enlarge established modern educational facilities in activities in the great and healthful out of doors where may be the better developed physical strength and endurance, self-reliance, and the powers of initiative and resourcefulness, all for the purpose of establishing through the boys of today the very highest type of American citizenship.

"It tends to conserve the moral, intellectual, and physical life of the coming generation, and in its immediate results does much to reduce the problem of juvenile delinquency in the cities. . . .

"The Scout scheme is based upon the methods involved in educating the boy. It is a scheme of placing the boy on honor. In addition to requiring him to live up to a standard or code of laws which insure development of character along proper lines, it requires him to study in order to pass certain tests of qualification. The passing of these various tests is recognized by the award of appropriate badges or medals and insignia.

"If any boy can secure these badges without meeting the required tests, the badges will soon be meaningless, and one of the leading features of the Scout program will be lost. Likewise, with the uniform which designates the Scout. At the present time this is protected by the use of insignia—a seal woven or stamped into the cloth. All of these various badges and insignia are at present protected by the patent laws, but under the patent laws such protection is available for a limited period only. The passing by Congress of this bill will, it is believed, provide the organization with proper protection for its distinctive insignia, the integrity of which is essential to the maintenance of the movement, and protect it from those who are seeking to profit by the good repute and high standing and popularity of the Scout movement by imitating it in name alone."

As soon as a boy joins the Boy Scouts, he becomes a member of a patrol, which is a group of three to eight boys of similar age. The goal of the Scout patrol is to help the boy become a good

outdoorsman; active in his troop and patrol; physically fit; a knowledgeable, participating citizen; and a young man who lives by the Scout Oath and Law. A Scout troop is composed of all the patrol members. The troop meets less frequently than the patrol, usually for hikes, campouts, camporees with other troops, and a yearly trip to summer camp.

Article VI, § 6, of the bylaws provides that local councils be chartered with jurisdiction over a prescribed geographical area.

"*Clause 1.* Local councils duly chartered by the Boy Scouts of America shall, wherever possible, become incorporated under the laws of their respective states pertaining to nonprofit corporations and pursuant to and consistent with these Bylaws and the Rules and Regulations of the Boy Scouts of America."

Article VII, § 1 states: "Youth membership in Boy Scouts of America is open to all who meet the membership requirements."

Article VIII, § 1 addresses adult leadership:

"No person shall be approved as a leader unless, in the judgment of the Corporation, that person possesses the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other leadership qualifications as it may from time to time require."

Under Article IX, § 1, the Declaration of Religious Principle appears:

"*Clause 1.* The Boy Scouts of America maintains that no member can grow into the best kind of citizen without recognizing an obligation to God. In the first part of the Scout Oath or Promise the member declares, 'On my honor I will do my best to do my duty to God and my country and to obey the Scout Law.' The recognition of God as the ruling and leading power in the universe and the grateful acknowledgement of His favors and blessings are necessary to the best type of citizenship and are wholesome precepts in the education of the growing members. No matter what the religious faith of the members may be, this fundamental need of good citizenship should be kept before them. The Boy Scouts of America, therefore, recognizes the religious element in the training of the member, but it is absolutely nonsectarian in its attitude toward that religious training. Its policy is that the home and the organization or group with which the member is connected shall give definite attention to religious life.

. . . .

"*Clause 2.* The activities of the member of the Boy Scouts of America shall be carried on under conditions which show respect to the convictions of others in matters of custom and religion, as required by the twelfth point of the Scout Law, reading, 'Reverent.' A Scout is reverent toward God. He is faithful in his religious duties. He respects the beliefs of others.

. . . .

· *"Clause 4. Only persons willing to subscribe to these declarations of principles shall be entitled to certificates of leadership in carrying out the Scouting program."*

## The Boy Scout Handbook, p. 549 (10th ed. 1961), provides:

"It is easy to join a scout troop, but it is not so easy to live up to the ideals of Scouting. For that, you need courage and determination.

"In some ways, Scouting is like a game with rules you must follow to be a member of the team. The rules of Scouting are found in the Scout Oath, Scout Law, Scout motto, and Scout slogan. It is by following these rules that you can become a true Scout."

## The Scout Oath provides:

"On my honor I will do my best
To do my duty to God and my country
and to obey the Scout Law;
To help other people at all times;
To keep myself physically strong,
mentally awake, and morally straight." p. 549.

## The Scout Handbook defines the meaning of the Scout Oath. With respect to the provision "To do my duty to God," the handbook states:

"Your family and religious leaders teach you to know and love God and the ways in which God can be served. As a Scout, you do your duty to God by following the wisdom of those teachings in your daily life, and by respecting the rights of others to have their own religious beliefs." p. 550.

## The Boy Scout Handbook further provides:

"The Scout Law is the foundation upon which the entire Scouting movement is built. The points of the Scout Law are a guide by which every Scout tries to live.

"The Scout Law is a statement of facts:

'A Scout is trustworthy . . . loyal . . . helpful . . . friendly . . . courteous . . . kind . . . obedient . . . cheerful . . . thrifty . . . brave . . . clean . . . reverent.'

"By doing all you can to live up to the Scout Law, you are a Scout. If you should *willfully* break the Scout Law, you violate the spirit of Scouting.

"The ideals of the Scout Law are very high. Strive to live by them, and you will excel on your own and as a part of your Scout troop, community, and nation." p. 553.

"Each point of the Scout Law is expressed in a single word rich with meaning. You should understand that meaning so well that you can explain it in your own words. What follows will help you reach that understanding.

. . . .

"A Scout is REVERENT. A Scout is reverent toward God. He is faithful in his religious duties. He respects the beliefs of others.

"The word *reverence* refers to a profound respect for God. The wonders of the world remind us of our God's creative power. We find it in the tiny lines of a leaf and the great mysteries of the universe. It exists in the kindness of people and in the teachings of our families and religious leaders.

"We show our reverence by living our lives according to the ideals of our beliefs. The Scout benediction is 'May the Great Master of all Scouts be with us until we meet again.'

"The United States Constitution gives each of us complete freedom to believe and worship as we wish without fear of punishment. All your life, you will encounter people who hold different religious beliefs or even none at all. It is your duty to respect and defend the rights of others whose beliefs may differ from yours." pp. 553-61.

Coronado Area Council, Boy Scouts of America is a Kansas not for profit corporation. The Coronado Area Council was incorporated pursuant to and consistent with the Boy Scouts of America.

### Bradford W. Seabourn

Until September 1991, Bradford W. Seabourn had participated in the Boy Scouts in one capacity or another for nearly 20 years. Seabourn began his involvement with Scouting as a Cub Scout at age 7 and continued through age 17, reaching the level of Life Scout. As an adult, Seabourn's involvement with Scouting spanned approximately 9 years, with the past 7 years as an Assistant Scoutmaster with Troop 76, BSA, Pawnee District, Coronado Area Council in Manhattan, Kansas.

The Coronado Council President printed, in the September 1991 issue of The Coronado Scout newsletter, a reaffirmation statement entitled "On Duty To God." The reaffirmation, as approved by the Boy Scouts of America National Executive Board, provided:

"ON DUTY TO GOD

"Be it resolved that the following reaffirmation of the position of the Boy Scouts of America relating to duty to God be, and hereby is, enacted and that the bylaws, rules and regulations, and literature of the Corporation reflect this reaffirmation accordingly.

"In 1985, America celebrated the seventy-fifth anniversary of the Boy Scouts of America. Since 1910, eighty million Americans have subscribed to the Scout Oath and the Scout Law, which have stood the test of time.

"The National Executive Board of the BSA proudly states, through its mission statement, that the values which the organization strives to instill in young people are those based upon the Scout Oath and the Scout Law. A Scout pledges: 'On my honor I will do my best to do my duty to God and my country and to obey the Scout Law. . . .'

"The first Boy Scouts of America Handbook for Boys, published in August 1911, declares that '. . . no boy can grow into the best kind of citizen without recognizing an obligation to God.' (page 561)

"While not intending to define what constitutes belief in God, the Boy Scouts of America is proud to reaffirm the Scout Oath and its declaration of duty to God. The following statements are additional information on the BSA position:

"The Boy Scouts of America has always been committed to the moral, ethical, and spiritual development of our youth. Scouting is not a religion, but duty to God is a basic tenet of the Scout Oath and Law.

"Scouting does not seek to impose its beliefs upon others who do not share them. Virtually every religion is represented in Scouting, and the BSA does not define or interpret God. That is the role of the Scout's family and religious advisors.

"Scouting respects those who do not share its beliefs and it would not ask others to alter their faith in any fashion in order to become Scouts. They too are free to follow their own beliefs. Rather, the BSA membership believes that the principles set forth in the Scout Oath and Law are central to the BSA goal of teaching the values of self-reliance, courage, integrity, and consideration to others. Scouting may not be for everyone, but for eight decades, Scouting has provided meaningful programs and adventure to more than eighty million young people in the United States."

On September 9, 1991, Seabourn wrote a letter responding to the above reaffirmation. Seabourn expressed his belief that he chose to define God as "nothing." Seabourn elaborated:

"When I say the Pledge of Allegiance, I pledge my oath to 'one Nation, under "nothing." '" When I say the Scout oath, I promise to 'do my duty, to "nothing" and my Country. . . .' When I say the Scout Law, I say a Scout is 'reverent' to 'nothing.'

"Call me a believer in 'nothing,' a nonbeliever, or call me an Atheist—they are one and the same."

Seabourn noted that he had been active in Scouting as a child. Apparently, Seabourn was not an atheist during his youth. He attended church and held the same religious beliefs as his parents. Moreover, until the present case, Seabourn had been active in scouting both as an adult leader and as the father of four boys, two of whom were old enough to participate in Scouting activities.

Seabourn's letter emphasized that he believed strongly that "Scouting has a lot to offer young men in their growth and development toward adulthood, as well as the larger goal of molding young people into members of society who will make a significant and lasting contribution to the human condition." Seabourn stated, however, that the reaffirmation titled "On Duty to God" needed a qualifier "that a belief in a supernatural being *is not* a necessary requirement for entrance into Scouting, and that respect for others' beliefs included respect for those who lack belief in God (or a god) as well."

Two days after Seabourn sent his letter, the Boy Scouts Coronado Council President advised Seabourn that the Council had denied Seabourn's registration to serve as an adult leader with the Boy Scouts. The letter further advised Seabourn of the appropriate procedure should Seabourn wish to request a review by the regional director of the termination of his Boy Scout registration.

On October 16, 1991, Seabourn wrote to the Boy Scouts Assistant Regional Director requesting such a review. Seabourn asserted the termination of his registration as an adult Scout leader was "entirely pernicious and arbitrary in nature, completely irresponsible and uninformed in its origin, and . . . demonstrat[ed] partiality and discrimination against [his] religious viewpoints." Seabourn further asserted:

"The fact that I am an Atheist is irrelevant to the central themes within Scouting of showing respect for other's beliefs; that Scouting is not a religion; that Scouting has not, nor does it attempt to define God (*i.e.*, the concept of God); that Scouting does not seek to impose its beliefs upon others; and that Scouting would not seek to alter anyone's faith in any fashion in order to become a Scout or remain a Scout. . . .

 . . . .

"To imply that anyone without religious beliefs cannot be as good a citizen of this country as those who advocate religion is to show considerable disrespect for, and a callous disregard to those who lack religious beliefs. This is not something I want taught to my children, and is not a respectful position for an organization with high ideals such as the Boy Scouts to take."

Finally, Seabourn wrote:

"[W]ith specific regard to the young, impressionable minds in Scouting, let me clarify one thing: I have never attempted to proselytize (either in word or deed)

anyone to my position concerning religion, most of all children who do not as yet have the full capacity to think critically (this includes my own children as well). I strongly feel such behaviour by anyone is completely opposed to the fundamental principle of religious freedom upon which this country and Scouting were founded."

In a letter dated November 12, 1991, the Boy Scouts Assistant Regional Director responded to Seabourn, advising him that the regional review process had upheld the denial of Seabourn's registration. On December 11, 1991, Seabourn wrote to the Chief Scout Executive, seeking review by a national board.

In February 1992, while the national review was pending, Seabourn wrote to the Boy Scouts National Executive Board requesting either a complimentary adult registration or waiver of the registration requirement so that Seabourn could accompany his 15-year-old son to Philmont Scout Ranch on a two-week "high adventure" scouting trip in mid-July. In April, Seabourn received written notice from the Boy Scouts National Office denying his request.

Seabourn contacted the Kansas Human Rights Commission (KHRC), seeking a restraining order against the Boy Scouts. Seabourn asserted the Boy Scouts' denial of his request to go to Philmont with his son violated the "public accommodations" section of the Kansas Act Against Discrimination (KAAD) on the basis of religious discrimination. On June 29, 1992, the Chief Legal Counsel for KHRC responded that KHRC had no statutory authority in public accommodations cases under KAAD to enjoin the Boy Scouts prospectively.

On July 9, 1992, Seabourn filed a motion in Riley County District Court for a temporary restraining order seeking to enjoin the Boy Scouts from barring Seabourn's accompanying his son on the Philmont trip. On July 10, 1992, the trial court denied the motion.

In September 1992, Seabourn filed suit against the Coronado Area Council in Riley County, under the Kansas Act Against Discrimination. Following discovery, the Boy Scouts filed a motion for summary judgment. The district court granted the motion, concluding that under Kansas law the Boy Scouts is not a public accommodation. The court stated:

"The Court has considered the statement of uncontroverted facts presented by defendants and plaintiff's statement in controvention thereof. The Court finds that in all respects where plaintiff attempts to controvert a fact, the disagreement is either merely a question of semantics or the contravertion does not go to a *material* issue of fact. For the sake of brevity of this opinion the Court will adopt defendants' proposed findings of fact #1 through 28 and 38 through 44 as part of its findings of fact. Further facts will be stated throughout as may be necessary for clarity. The defendants will be referred to collectively as the 'Boy Scouts.'

"Though not stated specifically in the pleadings, it appears that the argument between the parties is whether the Kansas Act Against Discrimination is applicable to the facts of this case. Plaintiff argues that it is, in that plaintiff claims the defendants are 'public accommodations' as that term is defined in the Act. Defendants claim that the Act does not apply and cites as its reasons:

1. Joining a Boy Scout Troop is not patronizing a place of business open to the general public;

2. Defendants are exempt because they are 'non-profit fraternal or social associations or corporations.'

3. Defendants did not discriminate by refusing to accept plaintiff's volunteer service.

"The significant issue to be decided is whether the Boy Scouts is a 'place of public accommodation' under Kansas law.

"The term 'Place of Public Accommodation' as used in the Kansas Act Against Discrimination has been interpreted 'to include those places of business which are held open to the general public and where members of the general public are invited to come for business purposes.' *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306 Syl. 5, 532 P.2d 1263. The court in this case further stated by way of illustration 'stores, shops, and other business establishments offering goods, facilities, and accommodations to the public are places of public accommodation within the meaning of the . . . Act. . . .' 216 Kan. 306, Syl 6.

"In this case the discovery record reflects that the Boy Scouts is not an organization open to the general public. Membership is limited to male youth between the ages of 11 and 18 who promise to observe the Scout Oath and Scout Law. The Scout Oath requires a member to do his duty to God. The Scout Law requires a member to be reverent.

"The information provided to parents of prospective members provides as follows:

'Leadership is restricted to qualified adults who subscribe to the Declaration of Religious Principle, The Scout Oath, and the Scout Law' and

'The Boy Scouts of America recognizes the importance of religious faith and duty; it leaves religious instruction to the member's religious leaders and family.' See *Biberstein Affidavit, Exhibit B.*

"The leadership application and accompanying materials provide as follows:

'The Boy Scouts of America maintains that no member can grow into the best kind of citizen without recognizing an obligation to God, and, therefore, recognize the religious element in the training of the member, but it is absolutely non-sectarian in its attitude toward that religious training. Its policy is that the name and the organization or group with which the member is connected shall give definite attention to religious life. Only persons willing to subscribe to this declaration of religious principle and to the Bylaws of the Boy Scouts of America shall be entitled to certificates of leadership.' *Biberstein Affidavit, Exhibit D.*

"It can thus be seen from the above that the Boy Scouts is not open to the 'general public', as suggested is necessary in *KCCR v. Sears*. Rather, it has limited its membership to a certain age group of young men and it has limited the availability of leadership positions to those adults who are willing to subscribe to the religious principles of the organization.

"The Court concludes the Boy Scouts is not a public accommodation as that term is used in Kansas law. The Court has reviewed the authority cited by plaintiff and finds it distinguishable in all cases either on the facts or because of statutory differences."

Seabourn filed a petition for reconsideration, which was denied. Seabourn appealed, and we transferred this case from the Court of Appeals for our consideration. K.S.A. 20-3018(c).

Seabourn contends the trial court erred when it discounted numerous triable issues of fact, including the sincerity and actual application of Boy Scout membership requirements and the nature and extent of the offering of goods and services by the Boy Scouts. Moreover, Seabourn takes issue with the trial court's consideration of the affidavit of Greg A. Biberstein, an individual to whom Seabourn objected and whose testimony he contradicted.

Summary judgment is governed by K.S.A. 60-256(c), which provides in part:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

With respect to the trial court's consideration of the Boy Scouts' motion for summary judgment, this court has stated that under K.S.A. 60-256(c):

"A motion . . . is to be sustained only where the record conclusively shows there is no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law. In considering such a motion the movant's adversary is entitled to the benefit of all reasonable inferences and doubts that may be drawn from the facts under consideration. Where the facts presented in the motion are subject to conflicting interpretations or reasonable persons might differ as to their significance summary judgment is improper. It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits." *Williams v. Community Drive-in Theater, Inc.*, 214 Kan. 359, 364, 520 P.2d 1296 (1974).

When the issue on appeal is whether the trial court correctly granted a summary judgment, an appellate court should read the record in the light most favorable to the party against whom summary judgment was entered. It should take such party's allegations as true, and it should give that party the benefit of the doubt when its assertions conflict with those of the movant. Factual inferences tending to show triable issues must be considered in the light most favorable to the existence of those issues. If there is a reasonable doubt as to the existence of fact, a motion for summary judgment will not lie. Moreover, pleadings and documentary evidence must be given a liberal construction in favor of the party against whom the motion is directed. *Mildfelt v. Lair*, 221 Kan. 557, 559, 561 P.2d 805 (1977).

The question then, is whether the facts Seabourn disputed on the summary judgment motion created a genuine issue of material fact to be resolved. As this court has long held:

"[A]n issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A feigned or imaginary issue is not a genuine issue. A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of a material fact." *Secrist v. Turley*, 196 Kan. 572, 575, 412 P.2d 976 (1966).

At the hearing on the summary judgment motion, the Boy Scouts presented evidence in support of its position in the form of testimony and exhibits. The Boy Scouts argued:

"What we have here is a case about the nature of Boy Scouting, the nature of adult volunteer leadership in Boy Scouting, and whether that's a matter which the Kansas legislature intended to regulate in the law before us. . . .

[T]here really isn't any very basic disagreement between the parties as to the basic nature of Boy Scouting. If in all the controverted facts put together by plaintiff be birds of a feather here to there, scouting is the same bird it started out as and the basic nature of scouting is not in dispute on the facts . . . .

. . . .

". . . The relationship of members of scouting to the organization and to one another is very, very different from the relationship of a patron to the kinds of business establishments explicitly mentioned or generally described in the statute and the kinds of establishments which the Supreme Court of Kansas has ruled are covered by the statute. When we go to the store to buy a loaf of bread or a bottle of soda we enter into a relationship which is episodic. It's—we pay fully for what we receive. We don't enter into a social relationship with the store clerk, and we don't do it for social reasons. We do that to accomplish the task of getting the loaf of bread or getting the bottle of soda. The relationship of members of the scouting organization is completely different. People are involved in scouting not to obtain an economic benefit, but rather to join together in an organization designed to accomplish a—particular goals in the development of character in youth. The relationship is continuous. One typically remains with one's scout troop for a period of years and meets weekly, at least, and if not more often. The relationship is personal, it is social, it is fraternal. There's a lot of bonding that goes on among the members of a Boy Scout troop in the associations which take place around the campfire, on the trail, and in the weekly meetings in the church hall. So that we have a totally different type of relationship, totally different type of organization, totally different type of goals and objectives that are involved in scouting as opposed to the kinds of relationships that are involved in commercial organization."

Seabourn's response was that the evidence shows the Boy Scouts to be a business establishment, notwithstanding its non-profit status:

"[W]hen one looks at the Boy Scout organization there are in essence two organizations. There is the corporate nature of the Boy Scouts, the one that hires and fires employees, the one that has 8,000 employees nation-wide in the organization, the one that maintains leaseholds, owns properties. One is a retail business, operates a scout shop, which in fact they do in the very council office here in the city and this state. One that runs various marketing divisions, including sales of magazines, one which you're familiar with—Boy's Life Magazine—and various other profit ventures associated with the Boy Scouts of America.

"At the same time there's a separate organization and one which covers the youth involvement in the organization, and the activities they engage in. One could not separate the two organizations. They are both part and parcel of each other. One joins the organization, pays fees. One buys merchandise through the

proceedings. The fact that they operate scout shops in the State of Kansas and elsewhere throughout the United States where the public can go to and buy certain merchandise shows clearly the nature of the retail business of this organization.
. . . .
"Based upon the documents filed by the Boy Scouts themselves there are 990 forms filed with the State of Kansas, there are annual reports showing the business nature of the organization, clearly show enough business purposes, attributes, facilities, accommodations to fit into the category of a business in this state.
". . . The Boy Scouts of America is listed under the IRS code as a 501(c)(3) nonprofit corporation. If the Boy Scouts were a nonprofit fraternal.or social charitable organization they would have to qualify under 501(c)(8) of the IRS code. And 501(c)(8) clearly applies to fraternal, beneficiaries, societies, orders, or associations. By its very documents this organization is not a fraternal, beneficiary, society, order, association and cannot use that as an exemption to get around the statute."

After the summary judgment hearing, the trial court considered the statement of uncontroverted facts presented by the Boy Scouts and Seabourn's statement in contravention thereof and found no genuine issue of material fact.

The trial court found in all instances where Seabourn controverted a fact as presented by the Boy Scouts, "the disagreement is either merely a question of semantics or the contravention does not go to a *material* issue of fact." The trial court adopted the Boy Scouts' proposed findings of fact regarding the Boy Scouts in general, excepting the facts on Cub Scouts.

We have considered the Boy Scouts' statement of uncontroverted facts and Seabourn's objections. We, like the trial court, conclude that the material facts are not in dispute. The question presented is essentially a question of law involving the meaning of "public accommodations" in the Kansas Act Against Discrimination. We are satisfied that the record below was sufficiently developed to allow the trial court to conclude this case by summary judgment.

The question for resolution is whether the Boy Scouts properly may exclude from positions of adult leadership persons who are unwilling to profess a belief in and duty to a supreme being. More specifically, the question is whether the Boy Scouts is a "public accommodation" as that term is used in K.S.A. 44-1002(h) of the Kansas Act Against Discrimination.

In order to answer this question, we must examine the pertinent sections of the Kansas Act Against Discrimination, Kansas case law interpreting the meaning of the term "public accommodations," and the authority cited by both Seabourn and the Boy Scouts from other jurisdictions dealing with similar questions.

The interpretation of a statute is a question of law. *State v. Donlay*, 253 Kan. 132, 133, 853 P.2d 680 (1993). "When determining a question of law, this court is not bound by the decision of the district court." *Memorial Hospital Ass'n, Inc. v. Knutson*, 239 Kan. 663, 668, 722 P.2d 1093 (1986).

K.S.A. 44-1001 *et seq.* sets forth the Kansas Act Against Discrimination. The pertinent provisions we deal with in this opinion are:

K.S.A. 44-1001:

"This act shall be known as the Kansas act against discrimination. It shall be deemed an exercise of the police power of the state for the protection of the public welfare, safety, health and peace of the people of this state. The practice or policy of discrimination against individuals in employment relations, in relation to free and public accommodations, in housing by reason of race, religion, color, sex, disability, national origin or ancestry or in housing by reason of familial status is a matter of concern to the state, since such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state. It is hereby declared to be the policy of the state of Kansas to eliminate and prevent discrimination in all employment relations, to eliminate and prevent discrimination, segregation, or separation in all places of public accommodations covered by this act, and to eliminate and prevent discrimination, segregation or separation in housing."

K.S.A. 44-1002:

"When used in this act:

"(a) 'Person' includes one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy or receivers.

. . . .

"(h) 'Public accommodations' means any person who caters or offers goods, services, facilities and accommodations to the public. Public accommodations include, but are not limited to, any lodging establishment or food service establishment, as defined by K.S.A. 36-501 and amendments thereto; any bar, tavern, barbershop, beauty parlor, theater, skating rink, bowling alley, billiard parlor, amusement park, recreation park, swimming pool, lake, gymnasium, mor-

tuary or cemetery which is open to the public; or any public transportation facility. Public accommodations do not include a religious or nonprofit fraternal or social association or corporation.

"(i) 'Unlawful discriminatory practice' means: (1) Any discrimination against persons, by reason of their race, religion, color, sex, disability, national origin or ancestry:

(A) In any place of public accommodations; or

(B) in the full and equal use and enjoyment of the services, facilities, privileges and advantages of any institution, department or agency of the state of Kansas or any political subdivision or municipality thereof . . . .

. . . .

"This term shall not apply to a religious or private fraternal and benevolent association or corporation."

Seabourn argues that the Boy Scouts is in fact a "public accommodation" as interpreted by our court in the seminal case of *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 532 P.2d 1263 (1975). Relying upon this case, Seabourn contends that the "umbrella clause" contained within the Kansas Act Against Discrimination clearly required a broad and expansive definition of "public accommodation" and that the Act prohibits discrimination by those establishments or "persons" which are held out to the general public and which members of the public are invited to patronize, or in the case of the Boy Scouts, join. Thus, according to Seabourn's argument, *Sears* makes clear that discrimination is prohibited by all "persons" that could reasonably be described as "offering goods, facilities, and accommodations to the public."

Seabourn further argues that in *Sears*, we relied on a New Jersey Supreme Court decision which adopted an expansive definition of the term "public accommodations" to include any establishment which caters to the public or by way of advertising or other forms of invitation induces patronage generally in a place of public accommodation. 216 Kan. at 315 (citing *Sellers v. Philip's Barber Shop*, 46 N.J. 340, 345, 217 A.2d 121 [1966]). Seabourn cites the following language from the *Sears* decision in support of his contention: "The history of anti-discrimination legislation in recent years appears to have been one of constantly expanding coverage," 216 Kan. at 316, and "we discern a continuing intent on the part of the legislature to strengthen civil

rights statutes and to enlarge the areas of their coverage." 216 Kan. at 316-17. Seabourn concludes by saying it is now "too late to argue that fifteen years after *Sears, Roebuck & Company* that it is time to restrict the meaning of the term 'public accommodation' as set forth in the Kansas Act merely because it now is sought to be applied to the largest youth organization in the world."

The *Sears* decision is of critical importance in resolving the issue presented by this appeal. While not the only Kansas case to have discussed the meaning of "public accommodations" as used in the Kansas Act Against Discrimination, it is the first case that interpreted the term "public accommodations" as used in the Act. Moreover, Seabourn's argument that the Boy Scouts is a "public accommodation" is based to a large extent on *Sears*.

In *Sears*, William V. Minner, who was black, filed a complaint with the Kansas Commission on Civil Rights complaining of a discriminatory practice by Sears, Roebuck, and Company in refusing him credit based upon his race, in violation of K.S.A. 44-1009(c)(1) (Weeks). The Commission issued a subpoena duces tecum to the credit manager of Sears, directing him to produce certain records. Sears did not comply with the subpoena, and the Commission filed an action in the District Court of Shawnee County under the provisions of K.S.A. 44-1004(5) (Weeks) to secure an order directing the manager to produce the subpoenaed documents. Such an order was entered with modifications, and Sears appealed. There was no cross-appeal. 216 Kan. at 308.

After dealing with procedural problems, the court noted that Sears presented two basic issues on appeal. "The first, in its words, is whether the commission had authority or jurisdiction to issue the subpoena. Or, to put the question in a somewhat different context, does a complaint such as Minner's come within the purview of the Kansas Act Against Discrimination[?]" 216 Kan. at 310. Sears argued that the area of consumer credit was not covered by the Act and that its retail establishment was not a place of public accommodation as defined in the Act. 216 Kan. at 311.

Sears argued that the Kansas Act Against Discrimination set forth a list of places of public accommodations, which did not

include a retail credit outlet, and that the term "place of public accommodation" must be read together with other subsections of the Act setting forth facilities that will be considered as public accommodations. In other words, Sears asserted that since the Act defined places of public accommodation to include hotels, motels, cabin camps, restaurants, and trailers, plus other facilities including a bar, tavern, barbershop, beauty parlor, theater, skating rink, bowling alley, billiard parlor, amusement park, recreation park, swimming pool, lake, gymnasium, mortuary, cemetery which is open to the public, or any public transportation facility, and did not include a retail credit operation, the term "public accommodation" simply did not cover its retail credit operation. 216 Kan. at 313.

In response to this argument, the court noted that "[i]n keeping with the broad public policy of eradicating the cancer of discrimination from our society, we interpret 'public accommodations' to mean those places which are held out as open to the general public and which members of the public generally are invited to patronize and otherwise visit." 216 Kan. at 313.

The court held:

"In keeping with the broad policy of eradicating discrimination from our society, the term 'place of public accommodations' is interpreted to include those places *of business* which are held open to the general public and where members of the general public are invited to come for *business purposes*." (Emphasis added.) 216 Kan. 306, Syl. ¶ 5.

The remainder of the *Sears* opinion deals with the question of whether a business establishment not expressly listed in the Kansas Act Against Discrimination may nevertheless be included as a "public accommodation" within the meaning of the Act. Citing with approval Dyson & Dyson, *Commission Enforcement of State Laws Against Discrimination: A Comparative Analysis of The Kansas Act*, 14 Kan. L. Rev. 29, 30 n.14 (1965), the court quotes at length:

" 'Kan. Sess. Laws 1965, ch. 323, §§ 1-11. The public accommodations coverage of the act, newly defined in 1965, combines two different philosophies of statutory draftsmanship: it used both an "umbrella clause" and a specific enumeration. Such combinations have often raised the question whether the detailed listing really is exclusive, rendering the broad clause nugatory under the principle

of *expressio unius est exclusio alterius*. Some civil statutes have been restricted in this way. See, GREENBERG, RACE RELATIONS AND AMERICAN LAW 103-05 (1959). A careful reading of the Kansas act makes it clear, however, that its umbrella clause is not restricted by the enumeration. Section 2 (*h*) defines "public accommodation" as "any person, as defined herein, who caters or offers his goods, facilities and accommodations to the public." That is the umbrella clause. The next subsection, (*i*), defines "unlawful discriminatory practice"

> as any discrimination against persons in a hotel, motel, cabin camp, restaurant or trailer court *and* the segregation against persons *in a place of public accommodations* covered by this act by reason of their race, religion, color, national origin, or ancestry. The term "unlawful discriminatory practice" *also* means any discrimination against persons in a bar, tavern, barbershop, beauty parlor, theater, skating rink, bowling alley, billiard parlor, amusement park, recreation park, swimming pool, lake, gymnasium, mortuary, cemetery which is open to the public or on any public transportation facility. (Emphasis supplied.)

Thus, the unlawful practices consist of discrimination in hotels, motels, etc., *and* in a public accommodation as broadly defined, and *also*—the key word—in the long list of enumerated facilities. The legislature probably intended to make sure that the enumerated facilities would be included within the general concept of public accommodations. Discrimination is prohibited, therefore, in *all businesses that could reasonably be described as offering "goods, facilities, and accommodations to the public."* ' (pp. 30, 31.)" 216 Kan. at 314. (Emphasis added.)

It is important to note that the *Sears* court concurred in the above analysis and the conclusion that discrimination is prohibited in all *businesses* that could reasonably be described as offering goods, facilities, and accommodations to the public. It is also important to keep in mind that *Sears* involved "discrimination in the area of consumer credit," an operation generally open to the public and an operation that is traditionally considered a place of public accommodation. Emphasizing the common understanding of people in regards to traditional public accommodations, *Sears,* before any discussion of the merits of the question whether a retail establishment was a public accommodation, concluded: "We are nonetheless convinced that unfair credit practices violate the spirit and essential nature of the Act 'to eliminate and prevent discrimination, segregation, or separation of all places of public accommodations covered by this act.' " 216 Kan. at 311.

Seabourn urges us to follow a New Jersey case we relied on in *Sears* and a number of New Jersey cases following our *Sears*

decision, adopting what he claims to be an expansive definition of public accommodations. According to New Jersey courts, "[a]n establishment which caters to the public or by advertising or other forms of invitation induces patronage generally is a place of public accommodation and cannot employ race, creed or color as a basis for refusing to serve members of the public who have accepted the invitation." *Sellers v. Philip's Barber Shop*, 46 N.J. at 345.

Seabourn focuses in particular on the aspect of Boy Scout advertising. Seabourn points to a 16-page advertising supplement about scouting that appeared in the October 1991 issue of Redbook magazine. Seabourn claims that the Boy Scouts advertisement in Redbook, which has a purported circulation of 3.9 million, failed to mention any requirement that a belief in God was necessary to become a Scout. Further, Seabourn claims an advertisement such as this is clearly an inducement to the general public for patronage, thereby establishing the Boy Scouts as a public accommodation.

Although advertising may be a consideration in determining whether a place is holding itself out to the general public or inviting the public's patronage, advertising alone is not enough to convert an otherwise private "person" into a place of public accommodation within the meaning of K.S.A. 44-1002(h).

Moreover, Seabourn's reliance on New Jersey authority is misplaced. *Sears* relied upon New Jersey authority for the proposition that merely because the statute does not list a certain facility, the failure to do so does not bar it from being a public accommodation. *Sellers* involved a place that was not listed in the New Jersey statutes and was cited in direct opposition to Sears' argument that "only the places listed may be considered within the statute." Thus, Seabourn's reliance upon *Sellers* provides little, if any support for his position that Kansas adopted the New Jersey definition of "public accommodation." *Sellers*, and later New Jersey cases cited by Seabourn, will be discussed at length below, for they do provide some guidance in our resolution of this issue.

Seabourn further relies upon *Sears* to suggest that a broad, sweeping definition of "public accommodations" is warranted. He extracts from *Sears* the phrases "constantly expanding coverage"

and "a continuing intent on the part of the legislature to strengthen civil rights statutes and to enlarge the areas of their coverage." 216 Kan. at 316-17. However, rather than suggesting a broad, sweeping definition of the term public accommodation, the *Sears* case uses those terms within the context of defining the coverage of the Act. *Sears* states:

"The history of anti-discrimination legislation in recent years appears to have been one of constantly expanding coverage. The Kansas experience illustrates the trend. The first Kansas Act Against Discrimination was adopted in 1961, although an anti-discrimination commission had been created in 1953, and although, also, a penal statute proscribing discrimination in certain limited areas had long been on the statute books.

"The 1961 Act pertained to unfair labor practices; it was geared to 'eliminate discrimination in all employment practices.' Two years later, in 1963, the legislature amended the Act to apply also to 'accommodations in hotels, motels, cabin camps, and restaurants.' It was not until 1965 that the Act, through amendment, was made to apply not only to lodgings and eating places but, in addition, to 'places of public accommodation.' In 1970 the Fair Housing Act was adopted, extending anti-discrimination legislation to the field of housing. Until 1972 discrimination because of race, religion, color, national origin or ancestry was proscribed in areas covered within the Act. In 1972 the word sex was added to the list and in 1974, physical handicap, giving further sweep to the Act.

"Viewing Kansas Civil Rights legislation in the perspective of recent history, we discern a continuing intent on the part of the legislature to strengthen civil rights statutes and to enlarge the areas of their coverage." 216 Kan. at 316-17.

The "constantly expanding coverage," "recent history," and "continuing intent on the part of the legislature to strengthen civil rights statutes and to enlarge the areas of coverage" all relate to acts of the legislature in expanding anti-discrimination legislation. This "constantly expanding coverage" has little to do with the meaning of "public accommodations" within the Kansas Act Against Discrimination.

Finally, *Sears* concluded: "We harbor little doubt that places of public accommodations were intended to include places where *general retail trade is conducted* and that in those places, distinctions are now not to be made based on race, religion, sex, physical handicap, ancestry or national origin." (Emphasis added.) 216 Kan. at 317. It is important to note that the court uses the term "general retail trade"—a business establishment and a place

which is commonly understood and accepted as a place of public accommodation.

The conclusion to be drawn from an analysis of *Sears* is that the term "public accommodations" was interpreted by *Sears* to include *those places of business* which are held open to the general public and where members of the general public are invited to come for *business purposes*. Thus, the term "public accommodations," as used in K.S.A. 44-1002(h) and "place of public accommodations" as used in K.S.A. 44-1002(i) include those *places of business held open to the general public* where members of the general public are invited *to come for business purposes*.

A further study of Kansas case law supports a more restrictive interpretation of "public accommodations." In *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, 544 P.2d 791 (1975), the question presented was whether the Kansas Commission on Civil Rights had "the authority to entertain an investigative complaint charging a city police officer with an unlawful discriminatory practice, based on the officer's decision to arrest the complainant and on the treatment afforded the complainant during the arrest and the time he was in custody." 218 Kan. 248, 249. The Commission based its argument on K.S.A. 44-1009 (Weeks), which provided that it was an unlawful discriminatory practice for any person to discriminate in the full and equal use and enjoyment of services, facilities, privileges and advantages *of any institution, department, or agency of the State of Kansas or any political subdivision or municipality thereof*. The court noted that on the face of the statute it might appear that the above language extended coverage to the services, facilities, privileges, and advantages of a governmental agency in any area of activity, but the court construed all parts of the act together *in pari materia*, concluding:

" 'When the interpretation of some one section of an act according to the exact and literal import of its words would *contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason,* disregarding so far as may be necessary the strict letter of the law.' [Citation omitted.]" 218 Kan. at 252.

The court concluded that the Act did not cover governmental conduct in any other areas that did not involve employment, public accommodations, and housing. 218 Kan. at 253.

Noting that discriminatory arrest did not fall into either employment or housing, the court determined, relying upon *Sears*, that such a police function is not a matter of "public accommodation." *Howard*, 218 Kan. at 253. Citing from the *Sears* decision, *Howard* noted that "[t]he public is not invited to 'patronize or otherwise visit' a municipal police department in the sense the term is used in the Act. A police department's law enforcement activities are therefore beyond the investigatory jurisdiction of the commission." 218 Kan. at 253.

*Howard*, instead of engaging in an expansive view of the language of the statute, limited application of the Act to employment relations, public accommodations, and housing, even though the express language in the statute seemed to authorize coverage of "services, facilities, privileges and advantages" of a governmental agency in any area of activity.

In *Kansas Comm'n on Civil Rights v. U.S.D. No. 501*, 243 Kan. 137, 755 P.2d 539 (1988), the question involved was whether the Kansas Act Against Discrimination granted jurisdiction to the Kansas Commission on Civil Rights to investigate complaints of discrimination in public schools. The question raised in *U.S.D. No. 501* is similar to that raised in *Howard*. As in *Howard*, we held that "the threshold issue is whether the governmental services were denied in the areas of housing, employment, and public accommodations." *U.S.D. No. 501*, 243 Kan. at 142. The court then proceeded to determine whether public schools were places of "public accommodations."

Relying upon *Sears*, the court concluded that public schools are not held as open to the general public and places where members of the general public are invited to patronize or otherwise visit. In resolving the issue, the court concluded:

"The legislative intent appears to be that the term 'public accommodations' includes all *businesses* which can reasonably be described as offering goods, services, facilities, and accommodations to the public. If the legislature had intended the public schools to be included within the concept of 'public accommodations,'

they would have specifically so stated. In addition, the inclusion of the word 'services' in section (h) can reasonably be construed to mean *business* and not educational services." *U.S.D. No. 501*, 243 Kan. at 143.

In *U.S.D. No. 501*, we did not divorce the definition of "public accommodations" from the term business, from a common understanding of public accommodations, and from a traditional public accommodation. Public schools are not businesses, nor are they the type of institutions that are traditionally thought of as "public accommodations."

Finally, in *Kansas Human Rights Comm'n v. Topeka Golf Ass'n*, 254 Kan. 767, 869 P.2d 631 (1994), we concluded that the Topeka Golf Association was a nonprofit social association or corporation exempt from the provisions of the Kansas Act Against Discrimination. On a petition for review, we adopted the opinion of the Court of Appeals, 18 Kan. App. 2d, 581, 856 P.2d 515 (1993). In its opinion, the Court of Appeals concludes:

"We are not unaware of the fact that certain organizations have seen fit to justify their discriminatory practices by claiming to be entirely social in nature. Where the record has shown that the organization in question was, in reality, a 'business establishment,' the courts have declared that such organizations may not discriminate under the guise of being a 'social organization.' One example of this is *Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 95 L. Ed. 2d 474, 107 S. Ct. 1940 (1987). Although this case has no significance to the instant matter, it is an example of an instance in which an organization which deemed itself to be social in nature was found to be in fact a 'business establishment.' We have examined the record for evidence of this nature and find nothing to support a conclusion that the TGA is a 'business establishment' or that it is anything other than a social association or corporation." (Emphasis added.) 18 Kan. App. 2d at 593.

Seabourn relies upon a line of New Jersey cases following *Sellers v. Philip's Barber Shop*, 46 N.J. 340, 217 A.2d 121 (1966), for his argument that the Boy Scouts is a "public accommodation." An examination of these cases, however, fails to lend support for his position.

In *Sellers*, Philip's Barber Shop refused to give service on the basis of race. Similar to the holding in *Sears*, the *Sellers* court notes that a barbershop is traditionally considered a place of public accommodation:

"But aside from common understanding and acceptance by the people that a barber shop is a place to which the public is invited indiscriminately, there is greater reason to regard it as a place of public accommodation than exists in many of the specific examples appearing in the statute." 46 N.J. at 345.

The *Sellers* court states that a barbershop must obtain a license from the state, its operators must be trained before they receive individual licenses and that the practice of barbering and the operation of barbershops enjoy an intimate relationship with the public interest and welfare. 46 N.J. at 346.

Finally, the *Sellers* court concludes:

"As we have indicated the license and registration of the barber and his shop, with the accompanying monopoly of the practice of barbering have brought him into the public domain and given him a special status. So long as he holds that status he cannot discriminate against a prospective patron who seeks his service, be he Negro or of any other race, any more than a lawyer or other professional person may discriminate for that reason." 46 N.J. at 347-48.

Seabourn's reliance upon the very general statement quoted above, that "[a]n establishment which caters to the public or by advertising or other forms of invitation induces patronage generally is a place of public accommodation," must be considered in context. The establishment in *Sellers* was one commonly understood and accepted by the public to be a place where the public is normally invited indiscriminately. *Sellers* involved a retail business establishment which advertised and which opened its doors to the public. *Sellers* presents a weak foundation for Seabourn's argument that because the Boy Scouts advertise nationally by inviting boys between certain ages to join the organization, it is a public accommodation. His argument falls by the weight of his claim that by advertising nationally and offering goods and services and facilities, the Boy Scouts thereby becomes a public accommodation. His argument ignores not only the basis of the *Sellers* decision but fails to consider the nature of the Boy Scouts organization and its focus and goals, not to mention that the offering of goods, services, and facilities, while in many instances nongratuitous, is incidental to the focus and goals of the Boy Scouts.

In the more recent case of *Clover Hill Swimming Club v. Goldsboro*, 47 N.J. 25, 33, 219 A.2d 161 (1966), the New Jersey

Supreme Court quotes *Sellers'* general statement that "[a]n establishment which by advertising or otherwise extends an invitation to the public generally is a place of public accommodation." This general statement forms the basis for Seabourn's argument that the Boy Scouts is a public accommodation. However, the cited case, when viewed in context, has no relationship to the issue we must decide.

In *Clover Hill Swimming Club*, individuals incorporated the swimming club under the New Jersey General Corporation Act. It was privately owned and operated for the purpose of returning a profit to its stockholders. It was organized principally to construct and operate beach, swimming, tennis, or recreation areas on the plan and form of a private membership club. No provision was made in the charter or bylaws for any membership control of club activities. The club advertised in the local papers. Dr. Goldsboro was denied membership because of his race, and the court notes:

"However, Clover Hill does not owe its existence to the associational preferences of its members but to the coincidence of their interest in the facilities offered by the owners. In other words, Clover Hill originated not because certain residents of Passaic Township wished to associate themselves in a swimming club, but rather because an entrepreneur was seeking a profitable investment." 47 N.J. at 34-35.

Viewed in context, *Clover Hill Swimming Club* provides little, if any, support for the argument that the Boy Scouts is a "public accommodation."

The final case relied on by Seabourn is *Nat. Org. for Women v. Little League Baseball*, 127 N.J. Super. 522, 318 A.2d 33 (1974). The New Jersey Supreme Court concluded that Little League Baseball may not exclude girls from playing baseball. The court held that "Little League is a public accommodation because the invitation is open to children in the community at·large, with no restriction (other than sex) whatever." 127 N.J. Super. at 531. It further noted that the Little League is "public in the added sense that local governmental bodies characteristically make the playing areas available to the local leagues, ordinarily without charge." 127 N.J. Super. at 531. Seabourn relies upon the following lan-

guage in support of his position that nonprofit status has no bearing on the question:

"Finally, we discern nothing in the statute or its underlying purposes to persuade us that what would otherwise be a place of public accommodation is any less so because its management and sponsorship is by a nonprofit or membership organization rather than a commercial enterprise, or because it does not have exclusive use or possession of the site of its operations." 127 N.J. Super. at 531-32.

Perhaps the only similarity between Little League baseball and the Boy Scouts is their nonprofit status. The Boy Scouts do not fit within the court's description that "the hallmark of a place of public accommodation was that 'the public at large is invited,' " and Little League offers "advantages and facilities on the basis of a general, public invitation to join." 127 N.J. Super. at 530. While the Boy Scouts advertise nationally, as the trial court concluded, membership is not open to the public at large, and services or facilities provided are incidental to the focus and goals of the Boy Scouts.

Far from establishing that the Boy Scouts is a public accommodation, the New Jersey cases relied upon by Seabourn echo much the same approach that Kansas has taken. It is significant that in all Kansas cases, the approach was to restrict rather than expand the interpretation of "public accommodations." *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 314, 532 P.2d 1263 (1975), expresses a clear policy that the application of the Kansas Act Against Discrimination will not be limited to those businesses listed but will be broad enough to include all businesses that could reasonably be described as offering goods, facilities and accommodations to the public.

The conclusion that may be drawn from Kansas cases interpreting "public accommodations" is that in a very broad sense and as a matter of public policy, Kansas abhors discrimination. However, in the area of public accommodations, the legislative intent is that the term "public accommodations" includes all businesses which can reasonably be described as offering goods, services, facilities, and accommodations to the public. Moreover, as gleaned from *Sears*, public accommodations may cover those

"persons" traditionally considered a public accommodation; that is, those places involving a common understanding and acceptance by the public as a place to which the public is invited indiscriminately.

Seabourn contends that if the Boy Scouts is not a public accommodation because of advertising or other forms of invitation, the Boy Scouts is a business establishment notwithstanding its nonprofit status. Seabourn argued before the trial court and on appeal:

"[W]hen one looks at the Boy Scout organization there are in essence two organizations. There is the corporate nature of the Boy Scouts, the one that hires and fires employees, the one that has 8,000 employees nation-wide in the organization, the one that maintains leasehold, owns properties. One is a retail business, operates a scout shop, which in fact they do in the very council office here in the city and this state. One that runs various marketing divisions, including sales of magazines, one which you're familiar with—Boy's Life Magazine—and various other profit ventures associated with the Boy Scouts of America.

"At the same time there's a separate organization and one which covers the youth involvement in the organization, and the activities they engage in. One could not separate the two organizations. They are both part and parcel of each other. One joins the organization, pays fees. One buys merchandise through the proceedings. The fact that they operate scout shops in the State of Kansas and elsewhere throughout the United States where the public can go to and buy certain merchandise shows clearly the nature of the retail business of this organization."

Seabourn cites numerous facts from the record that were considered by the district court prior to its granting summary judgment to the Boy Scouts. Some of those facts are gleaned from the 1991 annual report, funding of the Boy Scouts, the program marketing of the Boy Scouts, the Boy's Life magazine published by the Boy Scouts, advertisement in the Redbook magazine with a circulation of 3.9 million, tax returns and numerous forms filed with the state and national government on the 1991 income figure, and information on the Coronado Council with over 7,000 youth members served in 1991. In developing his argument, Seabourn relies almost exclusively on those aspects falling within what he says is Category 1, the business aspects of the Boy Scouts, but completely neglects and ignores the associational aspects of the Boy Scouts.

In support of his conclusion that the Boy Scouts is a "public accommodation," he relies upon the case of *Curran v. Mount Diablo Council of the Boy Scouts*, 147 Cal. App. 3d 712; 195 Cal. Rptr. 325 (1983) (*Curran* I), which, according to his claim, held that the Boy Scouts were subject to the Unruh Civil Rights Act in California. This Act provides in part: "All persons . . . are free and equal, and no matter what their sex, race, color, [or] religion . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51 (West 1982).

The *Curran* court did conclude: "[W]e find that to allow an organization to offer its facilities and membership to the general public, but exclude a class of persons on a basis prohibited by law would be contrary to the public policy expressed in the Unruh Act." 147 Cal. App. 3d at 732. As Seabourn further notes, the *Curran* court held that the concept of "organizational membership," per se, does place an organization outside of the scope of the Unruh Act unless it is shown that the organization is truly private.

However, the Boy Scouts note *Curran v. Mount Diablo Council of the Boy Scouts*, 29 Cal. App. 4th 192, 29 Cal. Rptr. 580, *rev. granted* 31 Cal. Rptr. 126 (1994) (*Curran* II). This case, even though perhaps not final because a petition for review by the California Supreme Court has been granted, deserves our consideration. Seabourn does not mention or discuss this case in his reply brief.

In *Curran* II, the court concluded that *Curran* I, to the extent it found that Mount Diablo Council was a business establishment, was in error. In *Curran* II, the court noted that its holding in *Curran* I was expressly limited to examining the sufficiency of the complaint. The court's only concern in *Curran* I was whether the plaintiff had succeeded in stating a cause of action. 29 Cal. App. 4th at 200.

The decision in *Curran* II notes that the trial court, on November 6, 1990, issued a decision regarding "business establishment." *Curran* II states:

"Judge Disco read the precedents available to her at that time as having caused '[t]he word "business" to lose "its commonly understood meaning." ' The court held that the term 'business' operated simply as an excluder, sweeping in *all* organizations except 'a small intimate, private club.' The court held that the Mt. Diablo Council could not prove it was a 'small, intimate, private club' based on the number of Scouts in the Council (approximately 13,500), a lack of selectivity in membership, and a 'public orientation and prominence in the community.' In holding that the evidence showed that Mt. Diablo Council was a 'business establishment' within the Unruh Act, the court recognized that it was extending the Unruh Act beyond any previously reported case . . . ." *Curran* II, 29 Cal. App. 4th at 200.

Before further discussion of *Curran* I and II, it should be noted that the language of the Unruh Act specifically uses the phrase "all business establishments of every kind whatsoever." However, as we have indicated above, our interpretation of the Kansas Act Against Discrimination convinces us that we may not divorce the concept of public accommodation from the usual meaning and the common understanding of the word business.

*Curran* II notes that the California Supreme Court decision in *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1159, 278 Cal. Rptr. 614, 805 P.2d 873 (1991), called "for judges 'to give meaning to every word and phrase in the [Unruh] statute' " and states that as a result California has "refused to extend the Act to situations not within the letter of the statute." *Curran* II, 29 Cal. App. 4th at 227. The *Curran* court noted that "prior to *Harris*, the Supreme Court had applied the Act to not-for-profit organizations in only two circumstances: (1) [w]here the organization had a business purpose [citations omitted], or (2) [w]here the organization existed to offer a traditional public accommodation. [Citation omitted.]" 29 Cal. App. 4th at 227.

In concluding that Mount Diablo Council did not fit within either category, the court noted that the trial court had "specifically found that Mt. Diablo Council had 'no substantial, or even significant, business purpose.' " 29 Cal. App. 4th at 227. (quoting *Welsh v. Boy Scouts of America*, 787 F. Supp. 1511, 1518 [N.D. Ill. 1992]). The court in *Welsh* stated that the "central purpose" of scouting "is to foster the development of certain skills and values in male youths."

*Curran* II notes that the Boy Scouts is not a traditional public accommodation. Interestingly enough, the court distinguishes a case relied upon by Seabourn to support his conclusion that the Boy Scouts is a public accommodation. That case is *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 219 Cal. Rptr. 150, 707 P.2d 212 (1985). Because Seabourn relies upon *Isbister*, we quote at length from *Curran* II, which distinguishes *Isbister* upon the very grounds on which Seabourn relies to support his position.

*Isbister* involved the Boys' Club of Santa Cruz, Inc., which provided a public recreational facility and limited its membership to boys. *Isbister* concluded that even though the Boys' Club did not have a business purpose, it was nevertheless a public accommodation. 40 Cal. 3d at 81. In discussing this case, the *Curran* II court notes:

"*Isbister* is the only case in which the California Supreme Court has applied the [Unruh] Act to an organization that lacked a business purpose. In applying the Act to the Boys' Club, the Supreme Court expressly relied on the fact that the function of the Boys' Club was to provide ' "public" ' 'recreational facilities' of the kind commonly thought to be a ' "public accommodation." ' (*Isbister v. Boys' Club of Santa Cruz, Inc., supra,* 40 Cal. 3d 72 at p. 81.) The court noted that boys used the Boys' Club facility on a drop-in basis, that there were few organized activities, and that the Club lacked 'any sense of social cohesiveness, shared identity, or continuity.' (*Ibid.*)

"The *Isbister* court took pains to make clear that its analysis did not extend to 'organizations . . . which maintain objectives and programs to which the operation of facilities is merely incidental.' (40 Cal. 3d at pp. 76-77.) The court went on to affirm that: ' *"Private" groups and institutions do not fall prey to the Act simply because they operate "nongratuitous" residential or recreational facilities for their members* or participants.' (Italics added.) (*Id.,* at p. 84, fn. 14.)

"In a vigorous dissent, Justice Mosk asserted that the decision would threaten 'the Boy Scouts, Club Scouts, Young Men's Christian Association, and similar organizations that maintain camps or physical facilities.' (40 Cal. 3d at p. 93.) In response, the majority retorted that 'Nothing we have said compels that result.' (*Id.,* at p. 84, fn. 14.)

"As the trial court noted here: 'Unlike the Boys Club in *Isbister*, Mt. Diablo Council is not a single purpose organization operating a traditional "public accommodation." ' The Council does own recreational facilities, namely the camps, but their operation is not the Council's 'principal activity and reason for existence' as the Club's provision of gym and pool facilities was. And the camps are not utilized on a causal, drop-in basis as Club, the facilities in *Isbister*, were.

"The relationships in scouting are ' "continuous, personal, and social" ' and 'take place more or less outside "public view." ' (*Isbister v. Boys' Club of Santa Cruz, Inc., supra,* 40 Cal. 3d at p. 84, fn. 14.) The court in *Isbister* held such relationships to be beyond the Act's reach. As Professor Horowitz, whom the *Isbister* court referred to as the principal commentator on the Act, has explained, the Act was not intended to reach relationships that are personal, social, continuous, and gratuitous. (Horowitz, *The 1959 California Equal Rights in 'Business Establishments' Statute—A Problem in Statutory Application* (1960) 33 So. Cal. L. Rev. 260, 288-290.) Rather, the statute should be applicable only to 'relationships in which the "establishment" offers its facilities for compensation, and in which the relationship with the patron is relatively noncontinuous, and in which personal and social aspects of the relationships are relatively insignificant.' (*Id.,* at p. 289.)

"Thus, a patron deals with a retail store episodically and irregularly, his interactions with store personnel are perfunctory and impersonal, and he pays prices which reflect the full cost of what is received. In contrast, a Boy Scout meets with his patrol once a week and with his troop once a month. The relationships with his fellow scouts and his scout leaders are close and personal. The time devoted to scouting by the youth members, and volunteered by their leaders, is gratuitous.

"The record here fully supports the same conclusion as the *Welsh* court that scouting is not a 'place of public accommodation': 'Having reviewed the body of evidence presented in this case, this Court is convinced that it would not particularly matter whether a Cub Scout den met in a club house, in a living room, or in a garage. The kinds of activities in which Boy Scout, Cub Scout, and Tiger Cub groups typically engage are not dependent upon the accoutrements of any particular location, let alone of a facility one would normally think of as a place of public accommodation. Rather, the success of the Boy Scouts, and the attraction to boys and their parents alike, lies in the sense of community among its participants.' (*Welsh v. Boy Scouts of America, supra,* 787 F. Supp. at p. 1539.)" 29 Cal. App. 4th at 228-230.

## In a telling observation, the *Curran* II court notes:

"To require such organizations to serve all comers would radically transform them and undermine their reason for existing. Indeed, if the characteristics listed by the court below were sufficient to classify an organization as a business establishment, then local Girl Scout groups and even the Archdiocese of Los Angeles of the Roman Catholic Church could not escape such classification either." 29 Cal. App. 4th at 231.

It is also interesting that in *Curran* II, the court notes the benefits which the Scouts and Scouters receive from participation in the program are overwhelmingly personal and noneconomic. The court found the evidence does not establish that scouting activities

enhance a Boy Scout's chances of getting into a college of his choice or advancing his chosen career to any greater extent than participation in any activity that can be included in a resume. 29 Cal. App. 4th at 201. In this connection, it should be noted that in a case relied upon by Seabourn, *Rotary Club of Duarte v. Board of Directors*, 178 Cal. App. 3d 1035, 224 Cal. Rptr. 213 (1986), which holds that the Rotary Club nonprofit membership organization was a business establishment subject to the provisions of the California Unruh Act, the court did so because of the business advantages to which such privilege of membership entitled the member. The same is true of *Lloyd Lions Club v. Int. Assoc. of Lions Clubs*, 81 Or. App. 151, 724 P.2d 887 (1986), wherein the court noted the business advantages for club members. Moreover, in *Fraternal Order of Eagles v. Tucson*, 168 Ariz. 598, 816 P.2d 255 (Ct. App. 1991), the Arizona Court of Appeals found the Fraternal Order of Eagles to be a "place of public accommodation" under the City of Tucson's ordinances because while the organization conducted some activities in private, they also had public fish frys, public bingo games, and a public smorgasbord. The fact that many more of their activities were public, not private, subjected them to the provisions of the ordinance.

The scope of "public accommodations" under K.S.A. 44-1002(h) includes business establishments and those establishments traditionally considered public accommodations. A broad, expansive coverage suggested by the plaintiff, divorcing "public accommodations" from business establishment or business purpose, which this court has not done in its past decisions, is not the law in Kansas.

The record supports our conclusion that the Boy Scouts has no business purpose other than maintaining the objectives and programs to which the operation of facilities is merely incidental. Moreover, relationships in scouting stand in stark contrast to retail or business-like establishments in that scouting relationships are continuous, personal, and social and take place, more or less, outside of public view; whereas business establishments or business-like establishments or those establishments commonly thought of as public accommodations involve interactions between store per-

sonnel and patrons that are perfunctory and impersonal, involving the payment of prices which reflect the full cost of what is received.

Affirmed.